ORIGINAL



**FILED**

Aug 08 2023

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY      s/ JulieOlsen      DEPUTY

Colleen Robbins (New York Bar No. 2882710)
Christopher E. Brown (Virginia Bar No. 72765)
Federal Trade Commission
600 Pennsylvania Ave., NW, CC-8528
Washington, DC 20580
(202) 326-2548; crobbins@ftc.gov
(202) 326-2825; cbrown3@ftc.gov
(202) 326-3395 (fax)

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

FEDERAL TRADE COMMISSION,

                Plaintiff,

v.

AUTOMATORS LLC, also d/b/a
AUTOMATORS AI and ECOM SKOOL,
a Nevada limited liability company,

EMPIRE ECOMMERCE LLC, a
California limited liability company,

ONYX DISTRIBUTION LLC, a
California limited liability company,

STRYDER HOLDINGS LLC, a
California limited liability company,

PELENEA VENTURES LLC, a
Tennessee limited liability company,

ROMAN CRESTO, individually and as
officer and/or owner of AUTOMATORS
LLC, EMPIRE ECOMMERCE LLC,
ONYX DISTRIBUTION LLC, and
STRYDER HOLDINGS LLC,

Case No.:   ~~23-cv-1444-BAS-KSC~~

ORDERED UNSEALED on **08/21/2023   s/ J. Olsen**

~~FILE UNDER SEAL~~

**COMPLAINT FOR PERMANENT
INJUNCTION, MONETARY
RELIEF, AND OTHER RELIEF**

JOHN CRESTO, individually and as officer and/or owner of AUTOMATORS LLC, EMPIRE ECOMMERCE LLC, ONYX DISTRIBUTION LLC, and STRYDER HOLDINGS LLC, and

ANDREW CHAPMAN, individually and as officer and/or owner of AUTOMATORS LLC, EMPIRE ECOMMERCE LLC, ONYX DISTRIBUTION LLC, and PELENA VENTURES LLC,

Defendants,

PEREGRINE WORLDWIDE, LLC, a Delaware limited liability company,

Relief Defendant.

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges: The FTC brings this action under Sections 5(a), 13(b), and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 53(b), and 57b, which authorize the FTC to seek, and the Court to order, temporary, preliminary, and permanent injunctive relief, monetary relief, and other relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the FTC's Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Business Opportunities" ("Business Opportunity Rule" or "Rule"), 16 C.F.R. Part 437, as amended, and the Consumer Review Fairness Act of 2016 ("CRFA"), 15 U.S.C. § 45b. The amended Business Opportunity Rule became effective on March 1, 2012, and has since that date remained in full force and effect.

## SUMMARY OF THE CASE

1.     This case is about the illegal sale of business opportunities and coaching programs that have caused consumers across the country over $22 million in harm.

2.     Roman Cresto ("Roman"), John Cresto ("John"), and Andrew Chapman ("Chapman") spearhead the operation of this California-based scheme, falsely promoting themselves as ecommerce experts and self-made millionaires who have helped thousands of consumers generate tens of millions of dollars.

3.     Beginning in early 2020, through Empire Ecommerce LLC ("Empire LLC") and Onyx Distribution LLC ("Onyx"), Roman, John, and Chapman (collectively, "Individual Defendants") deceived consumers into purchasing a "venture capital-backed" and "artificial intelligence-integrated" ecommerce business opportunity to become a "silent partner" in a profitable operation run by Empire LLC and Onyx.

4.     The Individual Defendants promised to expertly manage the operations of automated online stores on behalf of their "silent partners," including identifying products, fulfilling orders, and handling customer service.

5.     Empire LLC offered consumers various "automated" packages of ecommerce stores that typically cost between $10,000 to $125,000 for the initial investment, and an additional $15,000 to $80,000 for working capital. It falsely claimed that purchasers were likely to make monthly profit margins between 8 to 20 percent and claimed to use "AI machine learning" to maximize revenues.

6.     In truth, virtually all purchasers did not earn the advertised income. Most lost their entire investment and got saddled with hefty credit card debts. Moreover, nearly all the online stores that Empire LLC established and managed for its clients on Amazon.com and Walmart.com got suspended, and ultimately terminated, by those platforms for policy violations, leaving many clients banned from selling on those platforms.

7.     In January 2023, after their Empire LLC business ultimately imploded and they sold it to a third party, the Individual Defendants restarted their deceptive scheme under the name Automators AI, which claims to teach consumers how to use AI to find

top-selling products and become successful online sellers making "over $10,000 per month in sales." They also claim to coach consumers to use Chatgpt to create customer service scripts. The scheme is ongoing, defrauding consumers of tens of thousands of dollars each in violation of the FTC Act, the Business Opportunity Rule, and the Consumer Review Fairness Act.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345. This action arises under 15 U.S.C. §§ 45(a) and 53(b).

9.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2), (b)(3), (c)(1), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

10.    The FTC is an independent agency of the United States government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The Commission also enforces the Business Opportunity Rule, 16 C.F.R. Part 437, as amended, which requires specific disclosures and prohibits certain misrepresentations in connection with the sale of a business opportunity, and the Consumer Review Fairness Act, 15 U.S.C. § 45b, which limits provisions in form contracts that restrict a consumers' ability to communicate reviews about a business' products or services.

## DEFENDANTS

11.    Led by the Individual Defendants, the five Corporate Defendants that have run the deceptive scheme have marketed and sold the business opportunities and coaching services at issue, and/or funneled consumer payments to the Individual Defendants.

*Corporate Defendants*

12.    **Automators LLC** ("Automators"), also doing business as Automators AI

and Ecom Skool, is a Nevada limited liability company with its principal place of business at 2300 W. Sahara Ave, Suite 800, Las Vegas, Nevada 89102. Automators, in connection with the matters alleged herein, offers automation and coaching services under the name Automators AI, and receives payments in its corporate account for consumers' purchases. In connection with the matters alleged herein, Automators transacts or has transacted business in this district and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Automators has advertised, marketed, distributed, or sold business opportunities throughout the United States.

13. **Empire Ecommerce LLC** ("Empire LLC") is or was a California limited liability company with its previous principal place of business at 8605 Santa Monica Blvd, #51976, West Hollywood, California 90069. Empire LLC, in connection with the matters alleged herein, entered into contracts with and received payments from consumers for automated ecommerce business opportunities. In connection with the matters alleged herein, Empire LLC transacts or has transacted business in this district and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Empire LLC has advertised, marketed, distributed, or sold business opportunities throughout the United States.

14. **Onyx Distribution LLC** ("Onyx") is or was a California limited liability company with its principal place of business at 16518 Newcomb Street, San Diego, California 92127. Onyx is a wholly-owned subsidiary of Empire LLC. Onyx, in connection with the matters alleged herein, entered into contracts with and received payments from consumers for automated ecommerce business opportunities. In connection with the matters alleged herein, Onyx transacts or has transacted business in this district and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Onyx has advertised, marketed, distributed, or sold business opportunities throughout the United States.

15. **Stryder Holdings LLC** ("Stryder") is a California limited liability company

5

1    with its principal place of business at 1150 Garden View Road, Suite 230367, Encinitas,

2    California 92024. Stryder is 100 percent owner of both Empire LLC and Onyx. Stryder,

3    in connection with the matters alleged herein, received consumer payments for automated

4    ecommerce business opportunities from Empire LLC and Onyx, and subsequently

5    transferred the consumer payments to the Individual Defendants. Stryder, in connection

6    with the matters alleged herein, transacts or has transacted business in this district and

7    throughout the United States.

8         16.    **Pelenea Ventures LLC** ("Pelenea") is or was a Tennessee limited liability

9    company with its principal place of business located at 5006 University Dr. W. Unit 1743

10   Collegedale, Tennessee 37315. Pelenea, in connection with the matters alleged herein,

11   was marketed as the venture capital company that funded Empire LLC, but in truth and in

12   fact, was used to pay Empire LLC's employees and transfer consumer payments to the

13   Individual Defendants. Pelenea, in connection with the matters alleged herein, transacts

14   or has transacted business in this district and throughout the United States.

15                                  *Individual Defendants*

16        17.    **Roman Cresto** ("Roman") was CEO of Empire LLC and Onyx and is a co-

17   owner of Automators and Stryder. He is a signatory on the bank accounts for Automators,

18   Empire LLC, Onyx, and Stryder. Roman narrates marketing videos for Defendants'

19   business opportunities using false and unsubstantiated earnings claims, and executes

20   consumer contracts and termination agreements on behalf of Defendants. He is aware of

21   consumer complaints, routine suspensions of Defendants' managed online stores for

22   policy violations, and requests for refunds from deceived consumers. Roman has also

23   routinely asked consumers to sign agreements including a non-disparagement clause. He

24   resides in San Diego, California, and in connection with the matters alleged herein,

25   transacts or has transacted business in this district and throughout the United States. At

26   all times relevant to this Complaint, acting alone or in concert with others, Roman has

27   formulated, directed, controlled, had the authority to control, or participated in the acts

28   and practices of Automators, Empire LLC, Onyx and Stryder, including the acts or

practices set forth in this Complaint. Through his direct participation in, and control over, Automators, Empire LLC, Onyx and Stryder, Roman has had knowledge of the acts and practices constituting the violations alleged herein.

18.    **John Cresto** ("John") was the Chief Growth Officer of Empire LLC and Onyx and is a co-owner of Automators and Stryder. He is a signatory on the bank accounts for Automators, Empire LLC, Onyx and Stryder. John narrates marketing advertisements for Defendants' business opportunities and coaching programs using false and unsubstantiated earnings claims, and speaks with potential purchasers one-on-one to close the sales deals. He is aware of consumer complaints, routine suspensions of Defendants'-managed online stores for policy violations, and requests for refunds from deceived consumers. John resides in Encinitas, California, and in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, John has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Automators, Empire LLC, Onyx and Stryder, including the acts or practices set forth in this Complaint.  Through his direct participation in, and control over, Automators, Empire LLC, Onyx and Stryder, John has had knowledge of the acts and practices constituting the violations alleged herein.

19.    **Andrew Chapman** ("Chapman") was the Chief Financial Officer of Empire LLC and Onyx, is a managing member of Automators and sole owner of Pelenea. Chapman has managed employees of the scheme, and has been aware of consumer complaints, routine suspensions of Defendants' managed online stores for policy violations, and requests for refunds from deceived consumers. Chapman is also a signatory on the corporate accounts for each of the Corporate Defendants Automators, Empire LLC, Onyx, Stryder and Pelenea. Chapman resides in Rancho Santa Fe, California, and in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Chapman has formulated, directed,

controlled, had the authority to control, or participated in the acts and practices of Automators, Empire LLC, Onyx, Stryder and Pelenea, including the acts or practices set forth in this Complaint.  Through his direct participation in, and control over, Automators, Empire LLC, Onyx, Stryder and Pelenea, Chapman has had knowledge of the acts and practices constituting the violations alleged herein.

*Relief Defendant*

20.    **Peregrine Worldwide LLC** ("Peregrine") is a Delaware limited liability company with its principal place of business at 4560 Via Gaviota, Rancho Santa Fe, California 92067. Peregrine has received funds from Pelenea in the amount of $7,466,474.94 that can be traced directly to Defendants' unlawful acts or practices alleged in this Complaint, and it has no legitimate claim to those funds. These funds were used to buy a personal residence that is titled in the name of Peregrine.

## COMMON ENTERPRISE

21.    The Corporate Defendants, Automators, Empire LLC, Onyx, Stryder, and Pelenea, have operated as a common enterprise while engaging in the unfair or deceptive acts or practices alleged herein. Empire LLC and its sister company, Onyx, started operating their ecommerce business opportunity scheme through their parent company, Stryder, in early 2020. In November 2022, Roman and John sold Empire LLC and Onyx to a third party, but the sale did not include any financial assets of Empire LLC or Onyx. In January 2023, the Individual Defendants restarted their scheme, using funds from Empire LLC and Onyx, under the name Automators AI, using advertising and marketing materials they previously used to promote Empire LLC and Onyx.

22.    Corporate funds from Empire LLC were transferred to Automators and consumer payments flowed in succession through the bank accounts of Empire LLC and Onyx to Stryder and Pelenea to Roman, John and Chapman. For example, Stryder received over $7 million in consumer payments from Empire LLC and Onyx. Stryder also transferred over $7.7 million to Pelenea and the Individual Defendants.

23.    The Corporate Defendants have conducted the business practices described

herein through an interrelated network of companies, which have common ownership, officers, employees, business locations, and business functions; and that marketed and sold common services, shared revenues, and comingled funds.

24. Because the Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below. At all times relevant to this Complaint, the Individual Defendants have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants.

## COMMERCE

25. At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

### *The Empire Business Opportunity Scheme*

*Deceptive Marketing Rife with Lavish Earnings Claims*

26. Beginning in February 2020, Roman and John Cresto and Chapman deceptively advertised, marketed, distributed, promoted, and sold ecommerce business opportunities to consumers throughout the United States through Empire LLC and Onyx (collectively, "Empire"), which they advertised primarily through social media, such as Instagram and Twitter.

27. Roman, John, and Chapman promoted themselves as ecommerce experts and self-made millionaires who have experience scaling hundreds of third-party seller stores on Amazon.com, Walmart.com and Facebook marketplaces, and have helped thousands of consumers generate millions of dollars.

28. Empire's website claimed it was the "only automation company fully audited and backed by an experienced Venture Capital firm" and "integrates AI machine-learning into the automation process, resulting in increased revenue and margins."

29.     The website also contained enticing purported purchaser testimonials, such as "I have been able to leverage my credit lines to make more passive income in a few months than most people make in 1 year at their everyday jobs" and "my store has been able to do $1 million dollars in revenue in the past 4 months alone."

30.     Empire also paid affiliate marketers to promote Empire's business opportunity on social media by posting sales results and touting their purported success with Empire's expert assistance. For example, Roman recruited Daniel Baldus-Strauss as an affiliate. As Roman was well-aware, the Amazon store that Empire opened and managed for Baldus-Strauss was unprofitable and ultimately suspended by Amazon for policy violations. Nevertheless, as an affiliate, Baldus-Strauss promoted falsely on social media how he made significant passive income through his automated ecommerce stores with Empire, referred over 60 clients to Empire, and received over $1.5 million in commission fees from the scheme.

31.     Empire's marketing videos, websites, and emails featured lavish claims about the amount of money or profit Empire clients are likely to make, such as:

- "$4k-$6k consistently monthly net profit."

- "$50k in sales in his 2nd month on a new Walmart store."

- "Automation client makes $8500 profit in 1 month."

- "Automation and coaching client makes $597k in 8 months."

- "Client makes $260k profit in one year from 2 stores."

- "$200k in one month and 100% ROI in 8 months."

32.     After watching the advertisements, website, or speaking with an Empire affiliate, prospective purchasers typically spoke with John or Chapman. In numerous instances, John or Chapman explained to prospective purchasers the various "automated" packages Empire offered, which typically cost between $10,000 to $125,000 for the

initial investment. They also represented that Empire-managed stores were running profitably with monthly profit margins between 8 to 20 percent, and claimed to use "AI machine learning" to maximize revenues.

33.    In many instances, John also emailed prospective purchasers links to positive reviews from purported clients and a slide deck posted on Empire's website describing Empire's business opportunity. The deck stated that Empire managed 257 Amazon Marketplace stores with net monthly profit on all sales at approximately 8 to 20 percent. A screenshot from one such slide deck, captured from Archive.org for May 25, 2022, and which Empire also emailed to a prospective purchaser, is depicted below.

## Sales Projections for New Stores

| Month | Gross Sales | Profit Total | ROI Percentage |
|---|---|---|---|
| Month 1 | $1,000 to $10,000 | $100 to $2,000 | 8-20% |
| Month 2 to 4 | $5,000 to $20,000 | $500 to $4,000 | 8-20% |
| Month 4 to 8 | $20,000 to $55,000 | $1,500 to $11,000 | 8-20% |
| Month 8 to 12 | $60,000 to $80,000 | $4,500 to $16,000 | 8-20% |
| Month 12+ | $75,000 to $110,000 | $6,000 to $22,000 | 8-20% |
| Month 15+ | $110,000-200,000+ | $8,500 to $40,000 | 8-20% |

(These are sales targets and profit estimations. No specific sales or earnings are guaranteed. Each store's growth is unique.)
Empire Ecommerce is in no way affiliated, associated, authorized, endorsed by, or in any way officially connected with Amazon INC.
*Any monthly earnings, revenue, or profit discussed/shown in this document is in no way legally guaranteed and is just for explanation purposes.
Confidential and Proprietary. Copyright by Empire Ecommerce, LLC. 2021. All Rights Reserved.

‹  6  ›  ⋮                                                          🖵 Google Slides

34.    Empire offered prospective purchasers both new and "aged" stores. The aged stores purportedly already had a positive profitability history. Empire's slide deck also included sales projections and case studies that presented purported levels of sales and profits that purchasers could expect to make. A screenshot of sales projections for "aged" Amazon stores, captured from Archive.org for May 25, 2022, and which Empire also emailed to a prospective purchaser, is depicted below.

**Aged Amazon Stores: Sales Projections**

| Month | Gross Sales | Profit Total | Net Profit Margin |
|---|---|---|---|
| Month 1 | $10,000 to $30,000 | $800 to $6,000 | 8-20% |
| Month 2 | $30,000 to $60,000 | $2,500 to $12,000 | 8-20% |
| Month 3 | $40,000 to $80,000 | $3,500 to $16,000 | 8-20% |
| Month 4 | $60,000 to $120,000 | $5,500 to $24,000 | 8-20% |
| Month 5+ | $80,000 to $300,000 | $7,200 to $60,000 | 8-20% |

(These are sales targets and profit estimations. No specific sales or earnings are guaranteed. Each store's growth is unique.)
Empire Ecommerce is in no way affiliated, associated, authorized, endorsed by, or in any way officially connected with Amazon INC.
*Any monthly earnings, revenue, or profit discussed/shown in this document is in no way legally guaranteed and is just for explanation purposes.
Confidential and Proprietary. Copyright by Empire Ecommerce, LLC. 2021. All Rights Reserved.

‹  13  ›  ⋮                                                        🖵 Google Slides

35.    Beginning in February 2020, consumers signed initial store contracts predominantly with Empire LLC, but later switched to contracts mainly with Onyx in 2021.

36.    Consumers were lured in by Empire's earnings claims and promises that their Empire-managed stores would be profitable in short order. However, once they completed the initial purchase, it took several months until the stores were operational.

37.    During these ensuing months, Empire employees typically helped consumers with the "onboarding process," which involved registering for an LLC and business address, creating email addresses and logins for their store accounts, and establishing various supplier accounts. In addition to the initial fee paid to Empire, Empire had purchasers open business credit cards or loans allowing access to between $15,000-$80,000 to charge the inventory purchased to fulfill store customers' orders.

38.    Empire represented to its prospective purchasers that it would run the day-to-day operations of the stores, allowing purchasers to generate significant passive income. Purchasers were obligated to give Empire 35% of their profits.

*Suspensions and Terminations of Empire-Managed Stores by Marketplaces*

39.    Empire used the Fulfilled by Merchant ("FBM") model to sell on Amazon.com. Empire combined a method of product sourcing known as online sales arbitrage with a "dropshipping" method of order fulfillment. In practice, when a customer ordered an item sold by an Empire-managed store on Amazon.com, Empire purchased the item on behalf of the store owner at a lower price from another retailer, then sold the item for a small profit taking advantage of the price difference. Further, Empire directed that other retailer to directly ship the item to the customer.

40.    While Amazon allows dropshipping, a third-party store using this method of order fulfillment is required to follow Amazon's stated policies and procedures. For example, Amazon requires store owners that purchase products from a third-party retailer and have them shipped directly to customers to identify the store owner, not the third-party retailer, as the seller of record. The Empire-managed stores routinely violated that policy.

41.    In many instances, Empire told prospective purchasers that its expertise in managing stores included how to avoid suspensions, and that John and Roman had an "insider" to streamline getting stores approved and reinstated should suspension occur.

42.    In truth, Amazon suspended the majority of the Empire-managed stores within months of operation due mostly to dropshipping policy and intellectual property violations.

43.    By June 2022, less than 10 percent of the stores that Empire managed for its clients were active and generating sales, and by October 2022, most of those stores were suspended or terminated. Amazon's records show that it ultimately blocked, suspended, or terminated most of Empire's managed stores it was aware of for policy violations.

44.    Moreover, the majority of the Walmart.com stores that Empire attempted to open and manage for purchasers—often after the Empire-managed Amazon stores for those purchasers got suspended—were never activated or terminated for various policy violations.

45.    A suspension of a store by Amazon or Walmart locked any earnings that store might have generated. Because Empire typically had its clients pay for inventory on credit cards, many clients were left with high credit card debt that they were unable to repay with earnings.

46.    Empire's attempts to appeal suspensions often took several months and most of its clients ended up with blocked, suspended or terminated accounts.

*Empire's Earnings Claims were False and Unsubstantiated*

47.    For over two years, Empire advertised and marketed its business opportunities to consumers by making earnings claims as described above, even though virtually none of its purchasers had Empire-managed stores that operated without interruption for the duration of time advertised in the claims.

48.    Empire failed to disclose to prospective purchasers that Empire-managed stores were routinely suspended and terminated. Instead, it consistently and falsely claimed that it had hundreds of clients generating over $150 million in revenue. In truth, most of Empire's clients lost money and virtually none made the advertised amounts.

49.    Several former employees of Empire stated to the FTC that Empire's profit projections, discussed above, were completely fabricated.

50.    Despite having gross sales in their stores during the brief times their stores were opened, numerous Empire clients overall lost significant sums of money after subtracting the initial fee, Amazon or Walmart fees, inventory payments, store customer refunds, loan fees and interest, and onboarding and operating costs.

51.    According to Empire's head of customers service, Empire routinely received numerous calls, texts, and emails from clients complaining about their stores not performing as advertised, losing money, stores getting terminated, and not getting promised services. He estimates that 70 to 80 percent of customer support calls were complaints, and reports that John, Roman and Andrew were part of weekly meetings to discuss such complaints.

*Non-Disparagement Clauses and Failed Attempt to Switch Store Model*

52.    Many dissatisfied Empire clients who spent tens of thousands of dollars for stores that were ultimately suspended or terminated have requested refunds. In most instances, Empire has denied such requests.

53.    Rather than issue refunds, Empire typically offered purchasers a "remedy" in the form of another ecommerce store in a different marketplace. Since approximately August 2020, for purchasers to obtain a new store, Empire first required them to sign a termination agreement that included the following non-disparagement clause:

> **Non-disparagement.** Customer may not engage in any form of conduct, or make any statements or representations, that disparage or otherwise harm the other Party's reputation, goodwill, or commercial interests. Any form of public or private, oral, or written defamation, slander, traducement, malicious misinterpretation of facts and events by the Customer regarding the Company made after the Termination Date, shall be treated as grounds of breach of this Release and may result in legal action subjection to Section 5 below. If, prior to the Termination Date Customer has made any statements or comments, whether verbally or in writing, that would tend to disparage or harm Company, Customer will remove, retract and/or otherwise make such statements unavailable to any person or Party that is not subject to this Release.

54.    Empire included threats of "legal action" in the clause to intimidate and dissuade dissatisfied customers from filing complaints.

55.    Numerous Empire clients signed such termination agreements; many signing multiple agreements. Roman routinely signed these termination agreements as CEO on behalf of Empire.

56.    Many such Empire clients felt trapped because if they did not agree to switch stores, they would lose their entire investments.

57.    In late 2022, Empire attempted to switch clients whose stores were terminated to new Amazon stores using the Fulfilled By Amazon ("FBA") model. Under

this model, the third-party store owner must pre-purchase inventory wholesale, store it, and then send it to Amazon for processing and shipping once a purchase is made for fulfillment.

58.     Amazon, however, does not allow suspended or terminated store owners to open additional stores. In many instances, Empire instructed consumers to open these new stores under someone else's name and photo identification to circumvent that policy.

59.     Ultimately, none of the contemplated Empire FBA stores ever opened.

*Empire Failed to Provide Required Disclosures and Earnings Claim Statements*

60.     Empire did not provide prospective purchasers with disclosure documents required under the Business Opportunity Rule. Although Empire routinely made claims to prospective purchasers about likely earnings, it failed to provide prospective purchasers with an Earnings Claim Statement required by the Rule, which includes the beginning and ending dates when the represented earnings were achieved, and the number and percentage of all persons who purchased the business opportunity and achieved the stated level of earnings.

61.     Empire also failed to comply with the Rule's requirements that it provide prospective purchasers with written substantiation of its earnings claims, and with a list of purchasers and contact information of individuals who purchased the business opportunity within the last three years.

*The Sale of Empire/Onyx*

62.     In November 2022, Empire's employees temporarily lost access to the company's computer-based software systems and once access was restored, all of Empire's data, information, and email history were gone. John and Roman told the employees that they were behind the deletion of Empire's records.

63.     Soon thereafter, John and Roman announced to the employees that they had sold Empire to third-party purchaser, LCC Enterprises LLC, a Delaware limited liability company, owned by an individual named Daniel Cohen ("Cohen"). The sale, with a $100,000 price tag, included Empire's client list, but not its financial assets.

64.     Immediately after the sale, Cohen was flooded with numerous complaints from angry Empire clients.

65.     In December 2022, Cohen filed a lawsuit against Roman, John, and Stryder in this district, *LCC Enterprises LLC v. Roman Cresto, et al.*, No. 3:22-cv-01944-DMS-BGS (S.D. Cal. Mar. 28, 2023) for breach of contract and fraud, and he hired a bankruptcy attorney in Florida to file a Petition Commencing Assignment for the Benefit of Creditors.

### *The Deceptive Automators Scheme*

66.     In January 2023, Roman, John, and Chapman restarted their scheme using the company Automators LLC and the brand names Automators AI and Ecom Skool, reusing much of the marketing materials and deceptive claims previously used to lure consumers to Empire, while promoting themselves as successful entrepreneurs who started and scaled a recently acquired "8 figure" "tech company" that managed "over 1000 profitable" ecommerce stores for their clients.

*Automators' Business Opportunities Scheme*

67.     Like Empire, Automators uses social media ads. A screenshot from Automators' Instagram page, captured on June 26, 2023, is shown below, and is typical of the social media that the company uses.



68.    Automators promotes its automation business opportunity as a "Done For You" service, through which purchasers can generate risk-free passive cash flow every month without lifting a finger.

69.    Automators claims that it acts as a middleman to connect purchasers with fully vetted partner Amazon automation fulfillment companies.

70.    In many instances, however, John and other salespeople tell prospective purchasers that Automators will set up the online store, manage it, assist with opening business credit cards to use for inventory purchases, and "hold your hand every step of the process." In some instances, John even tells prospective purchasers that he personally oversees the onboarding process to ensure a smooth process.

71.    Automators has connected purchasers with Amazon automation fulfillment companies, such as Next Level Digital Agency, Activ8, and Ascend Ecom. Ascend Ecom, which advertises that it uses both the FBA and FBM fulfillment models, appears to be Automators latest partnership.

72.    Automators' marketing includes a website, videos and webinars narrated by John and Roman that include depictions of a lavish lifestyle, enticing client testimonials, and case examples showing purported success stories.

73.     Roman claims he is a "leading 8-figure Amazon entrepreneur and creator of industry leading wealth-generation systems." He states in his videos that he is a college dropout who, at 20 years old, was able to purchase a McLaren Spider sportscar for himself and a Tesla for his mother and travel the world.

74.     Automators' marketing includes numerous testimonials and case studies showcasing the purported successes of its clients. While often undisclosed, some of those purported success stories are from Empire employees.

75.     Automators' ads present graphs and sales projections that depict projected earnings claims. A screenshot of a "Financial Projection Breakdown" showing Return on Investment ("ROI") percentages between 10 and 25 percent, captured on January 22, 2023, is depicted below. Also depicted below are additional screenshots of Automators ads with express earnings claims, including lavish revenue and profits projections, taken on January 11, 2023.

### OUR AMAZON MANAGEMENT
### FINANCIAL PROJECTION BREAKDOWN

| Month | Monthly Gross Sales | Monthly Profit Totals | ROI Percentages |
|---|---|---|---|
| 1-2 (Warm Up Period) | up to $10,000 | up to $3,000 | 10 - 25% |
| 3-4 | $3,000 - $20,000 | $300 - $6,000 | 10 - 25% |
| 5-8 | $10,000 - $40,000 | $1,000 - $12,000 | 10 - 25% |
| 9-12 | $20,000 - $80,000 | $2,000 - $24,000 | 10 - 25% |
| *First Year Totals:* | *$125,000 - $540,000* | *$12,500 - $162,000* | *10- 25%* |
| 12-16 | $60,000 - $110,000 | $6,000 - $33,000 | 10 - 25% |
| 16-20 | $100,000 - $135,000 | $10,000 - $40,500 | 10 - 25% |
| 20-24+ | $135,000 - $185,000+ | $13,500 - $55,500+ | 10 - 25% |

*Please note these numbers are before our profit splits

**AUTOMATORS**

## GET A 100% DONE-FOR-YOU, <u>PASSIVE INCOME MACHINE</u>, WITH AMAZON AUTOMATION.

🔊 Click the video to play and turn on sound

## *Compounding Earnings*

How monthly working capital spend can increase your earning potential

Example: 20% ROI on capital spend per month

- **Month 1:** Inventory Spend **$10k, $2k** Net Profit on your store
- **Month 2:** (Reinvest your profits from month 1) Inventory Spend **$12k, $2,400** Net Profit
- **Month 3:** Inventory Spend **$14.4k, $2,880** Net Profit
- **Month 4:** Inventory Spend **$17k, $3,400** Net Profit
- **Month 5:** Inventory Spend **$20.4k, $4k** Net Profit
- **Month 6:** Inventory Spend **$25k, $5k** Net Profit



Automators LLC is in no way affiliated, associated, authorized, endorsed by, or in any way officially connected with Amazon INC. *Any monthly earnings, revenue, or profit discussed/shown in this document is in no way legally guaranteed and is just for explanation purposes. Confidential and Proprietary. Copyright by Automators. LLC 2022. All Rights Reserved.*

| Bundle type | Amazon FBA Wholesale | | |
|---|---|---|---|
| Working Capital Per Store | $            50,000.00 | | |
| Management Profit Percentage | 30% *year-2* | | *year-2* |
| AVG Sales Projections | 121% | 135% | 139% |

| | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| Gross Revenue | $        560,370.87 | $      1,065,587.32 | $      1,933,021.27 |
| Management Fee | $          29,513.29 | $           88,452.54 | $         161,955.84 |
| Client's Profit | $          68,864.33 | $         206,389.26 | $         377,896.95 |

76.    Automators sells several packages that allow a purchaser to become a passive "capital partner." They cost between $35,000 and $65,000. Purchasers commit to give Automators' Amazon automation company partners 30 percent of their store's profit.

77.   Automators' videos, including those narrated by Roman, describe Automators' alleged use of artificial intelligence to find top-selling products to sell and list popular brands that Automators' clients have purportedly sold in their stores.

78.   Automators receives commission payments from its Amazon automation company partners for every consumer it signs up with them.

79.   Like Empire's earnings claims, Automators' earnings claims regarding its business opportunities are false and unsubstantiated. Most purchasers do not recoup their investment, let alone make the advertised amounts.

80.   As with Empire, Automators does not provide purchasers of its business opportunities with the documents and disclosures required by the Business Opportunity Rule.

*Automators' Business Coaching Scheme*

81.   Automators also offers coaching services on selling on Amazon.com through a program called Ecom Automation Accelerator, sometimes offered under the brand name Ecom Skool.

82.   This "Done With you" program typically costs $5,000 and is marketed as a "comprehensive Amazon coaching program and community to help entrepreneurs build their digital ecommerce business." The program also claims to coach consumers to use Chatgpt to write customer service scripts. Its ads feature statements such as:

- "We've recently discovered how to use AI tools for our 1 on 1 Amazon coaching program, helping students achieve over $10,000/month in sales!"

- "use AI or chatgpt tools like chatgpt to scale an Amazon store to 10k a month and beyond"

- "That is how you make $6000 net profit and that is how you find a product in 5 minutes using AI, Grabbly, Priceblink."

- "Here is an interview with one of our past students who made over $200k in sales in a single month."

- "Check out this video to see how one of our students made $150k in 4 months on his Amazon store."

83.     The coaching program offered by Automators teaches purchasers the dropshipping fulfillment method, previously used by Empire. Automators claims that this method is risk-free because inventory is purchased on an as-needed basis.

84.     Especially considering Empire's history of routine store suspensions and terminations, Automators' "risk-free" claim is deceptive.

85.     Automators' earnings claims regarding its coaching services are false or unsubstantiated. The testimonials and case studies, often from former Empire employees, are atypical and are nowhere near what the average purchaser can expect. Moreover, Automators does not track the results of its coaching clients, and virtually none of them make the advertised amounts and most do not recoup their investments.

**Defendants' Inadequate Disclaimers Do Not Cure Their Misrepresentations**

86.     Defendants, during both the Empire and Automator schemes, have often included written disclaimers on their websites and in their marketing materials. However, as shown by the examples discussed below, these disclaimers have been neither clear nor conspicuous, and they have not cured Defendants' widespread misrepresentations regarding the earnings that purchasers are likely to realize.

87.     For example, after consumers watch an Automators marketing video for the Amazon business opportunities on Facebook, they are encouraged to click on a link that takes them to the automators.ai website. There, consumers watch a slideshow describing the business opportunities.

88.     At the very bottom of each slide, in small typeface, Automators states, "Any monthly earnings, revenue, or profits discussed/shown in this document is in no way legally guaranteed and is just for explanation purposes."

89.     After watching the slideshow, typically narrated by Roman, consumers can scroll to the bottom of the automators.ai website and find another disclaimer, below the fold, in small typeface that states, "No client's success, earnings, or production results should be viewed as typical, average, or expected."

90.     There are also links at the bottom of the website, below the fold, that say, "Privacy Policy," "Terms of Service," and "Earnings Disclaimer." These links, however, are typically non-functional and merely take the consumers back to the top of the main webpage.

91.     From Instagram, a consumer can access the automators.ai website that contains another nearly illegible disclaimer stating in convoluted language, "Automator's experiences with online business are not typical: he is an experienced eCommerce seller and marketer. The program demonstrates how Roman, and his team of experts use proprietary technology, experience and expertise to identify potentially successful products to sell on online. We do not track the typical results of our customers or verify the accuracy of publicly available student testimonials."

92.     These disclaimers contradict the numerous repeated lavish and express earnings claims posted in color and in large font above the fine print disclaimers and included in the social media ads and the marketing videos.

## **VIOLATIONS OF THE FTC ACT**

93.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

94.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

95.     As set forth below, Defendants have engaged and continue to engage in violations of Section 5(a) of the FTC Act in connection with the advertising, marketing, and sale of their business opportunities and training programs/services.

## COUNT ONE

### False or Unsubstantiated Earnings Claims

96.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of Defendants' business opportunities and training programs, Defendants have represented, directly or indirectly, expressly or by implication, that purchasers of Defendants' business opportunities and Defendants' automation and coaching services are likely to earn substantial income.

97.     The representations set forth in Paragraph 96 above, are false, misleading, or were not substantiated at the time the representations were made.

98.     Therefore, the representations of Defendants as set forth in Paragraph 96 above, are false, misleading or unsubstantiated, and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE BUSINESS OPPORTUNITY RULE

99.     The amended Business Opportunity Rule, 16 C.F.R. Part 437, which was extended in scope to cover certain work-at-home opportunities, became effective on March 1, 2012, and has since that date remained in full force and effect.

100.    Defendants are "sellers" who, as described in Paragraphs 26 to 85, have sold or offered to sell "business opportunities" as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(c) and (q). Under the Business Opportunity Rule, a "seller" is a person who offers for sale or sells a business opportunity. 16 C.F.R. § 437.1(q). Under the Rule, a "business opportunity" means a "commercial arrangement" in which a "seller solicits a prospective purchaser to enter into a new business;" the "prospective purchaser makes a required payment;" and the "seller, expressly or by implication, orally or in writing, represents that the seller or one or more designated persons will . . .[p]rovide outlets,

accounts, or customers, including, but not limited to, Internet outlets, accounts, or customers, for the purchaser's goods or services[.]" 16 C.F.R. § 437.1(c).

101.   Among other things, the Business Opportunity Rule requires sellers to provide prospective purchasers with a disclosure document in the form and using the language set forth in the Business Opportunity Rule and its Appendix A, and any required attachments. In the disclosure document, the seller must disclose to prospective purchasers five categories of information, including: basic identifying information about the seller, any earnings claims the seller makes, the seller's litigation history, any cancellation and refund policy the seller offers, and contact information of prior purchasers. 16 C.F.R. § 437.3(a)(1)-(5). Furthermore, this information must be disclosed at least seven (7) days before the prospective purchaser signs a contract or makes a payment. 16 C.F.R. § 437.2. The pre-sale disclosure of this information enables a prospective purchaser to contact prior purchasers and take other steps to assess the potential risks involved in the purchase of the business opportunity.

102.   Defendants, as described in Paragraphs 31 to 34, 67, 74 to 75, and 82, have made earnings claims in connection with the sale of their business opportunities, as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(f). Under the Business Opportunity Rule, an "earnings claim" means "any oral, written, or visual representation to a prospective purchaser that conveys, expressly or by implication, a specific level or range of actual potential sales, or gross or net income or profits." 16 C.F.R. § 437.1(f).

103.   The Business Opportunity Rule prohibits sellers from making earnings claims unless the seller: (1) has a reasonable basis for the claim at the time it is made; (2) has in its possession written materials to substantiate the claim at the time it is made; (3) furnishes an Earnings Claim statement to prospective purchasers in conjunction with the disclosure document, containing, among other things, information regarding the time frame captured by the earnings claim, the characteristics of the purchasers, and the number and percentage of all persons who purchased the business opportunity within the time frame who achieved at least the stated level of earnings; and (4) makes written

substantiation of the earnings claim available to any prospective purchaser who requests it. 16 C.F.R. § 437.4(a).

104.   Defendants have also made earnings claims in connection with the sale of their business opportunities in the general media, as defined by the Business Opportunity Rule, 16 C.F.R. § 437.1(h). Under the Business Opportunity Rule, "general media" means "any instrumentality through which a person may communicate with the public, including, but not limited to, television, radio, print, Internet, billboard, Web site, commercial bulk email, and mobile communications." 16 C.F.R. § 437.1(h).

105.   The Business Opportunity Rule prohibits sellers from making earnings claims in the general media unless the seller has a reasonable basis for and written substantiation of any earnings claims and states in immediate conjunction with those claims the beginning and ending dates when the represented earnings were achieved, and the number and percentage of all persons who purchased Defendants' business opportunity prior to that ending date who achieved at least the stated level of earnings. 16 C.F.R. § 437.4(b).

106.   Defendants, as described in Paragraphs 31 to 34, 67, 74 to 75, and 82, have disseminated industry financial, earnings, or performance information in connection with the offering for sale, sale, or promotion of a business opportunity.

107.   The Business Opportunity Rule prohibits sellers from disseminating industry financial, earnings, or performance information unless the seller has written substantiation demonstrating that the information reflects, or does not exceed, the typical or ordinary financial earnings, or performance experience of purchasers of the business opportunity being offered for sale. 16 C.F.R. § 437.4(c).

108.   Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the Business Opportunity Rule constitutes an unfair or deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT TWO

### Misrepresentations Regarding Income or Profits

109.   In numerous instances in connection with the offer for sale, sale, or promotion of business opportunities, Defendants have misrepresented the amount of sales, or gross or net income or profits, a prospective purchaser may earn or that prior purchasers have earned.

110.   Therefore, Defendants' acts and practices, as described in Paragraph 109, violate the Business Opportunity Rule, 16 C.F.R. § 437.6(d) and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT THREE

### Disclosure Document Violations

111.   In numerous instances in connection with the offer for sale, sale, or promotion of business opportunities, Defendants have failed to furnish prospective purchasers with a disclosure document and any required attachments, within the time period prescribed by the Business Opportunity Rule.

112.   Therefore, Defendants' acts and practices, as described in Paragraph 111 above, violate the Business Opportunity Rule, 16 C.F.R. §§ 437.2 and 437.3(a), and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT FOUR

### Earnings Claims to Prospective Purchasers Violations

113.   In numerous instances, Defendants have made earnings claims to prospective purchasers in connection with the offering for sale, sale, or promotion of a business opportunity while, among other things: (1) lacking a reasonable basis for the earnings claim at the time it was made; (2) lacking written substantiation for the earnings claim at the time it was made; or (3) failing to provide an earnings claim statement to the prospective purchasers, as required by the Business Opportunity Rule.

114.    Therefore, Defendants' acts and practice, as described in Paragraph 113 above, violate the Business Opportunity Rule, 16 C.F.R. § 437.4(a) and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT FIVE

### General Media Earnings Claims Violations

115.    In numerous instances, Defendants have made earnings claims in the general media in connection with the offering for sale, sale, or promotion of a business opportunity while failing to state in immediate conjunction with those claims the beginning and ending dates when the represented earnings were achieved, and the number and percentage of all persons who purchased Defendants' business opportunity prior to that ending date who achieved at least the stated level of earnings.

116.    Therefore, Defendants' acts and practice, as described in Paragraph 115 above, violate the Business Opportunity Rule, 16 C.F.R. § 437.4(b) and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT SIX

### Industry Financial, Earnings, or Performance Information Violations

117.    In numerous instances, Defendants have disseminated industry financial, earnings, or performance information in connection with the offering for sale, sale, or promotion of a business opportunity while lacking written substantiation demonstrating that the information reflects, or does not exceed, the typical or ordinary financial earnings, or performance experience, of purchasers of the business opportunity being offered for sale.

118.    Therefore, Defendants' acts and practice, as described in Paragraph 117 above, violate the Business Opportunity Rule, 16 C.F.R. § 437.4(c) and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE CONSUMER REVIEW FAIRNESS ACT

119.    The CRFA defines "covered communication" as "a written, oral, or pictorial review, performance assessment of, or other similar analysis of, including by electronic

means, the goods, services, or conduct of a person by an individual who is party to a form contract with respect to which such person is also a party." 15 U.S.C. § 45b(a)(2).

120.   The CRFA defines "form contract" to mean "a contract with standardized terms (i) used by a person in the course of selling or leasing the person's goods or services; and (ii) imposed on an individual without a meaningful opportunity for such individual to negotiate the standardized terms." 15 U.S.C. § 45b(a)(3).

121.   The CRFA renders void any provision of a form contract if such provision prohibits or restricts the ability of an individual who is a party to the form contract to engage in a covered communication. 15 U.S.C. § 45b(b)(l).

122.   The CRFA prohibits any person from offering a form contract containing a provision described as void in sub-section (b) of the CRFA. 15 U.S.C. § 45b(c).

123.   Pursuant to the CRFA, a violation of sub-section (c) of the CRFA shall be treated as a violation of a rule defining an unfair or deceptive act or practice prescribed under Section 18(a)(1)(B) of the FTC Act, 15 U.S.C. § 57a(a)(l)(b), and the FTC shall enforce the CRFA in the same manner, by the same means, and with the same jurisdiction, powers, and duties as the FTC Act. 15 U.S.C. § 45b(d).

124.   Defendants have offered "form contract[s]," as that term is defined in the CRFA. 15 U.S.C. § 45b(a)(3).

## COUNT SEVEN

### Violations of the CRFA

125.   In numerous instances, including as described in Paragraphs 52 to 55, Defendants have offered, in the course of selling their business opportunities, "form contracts," containing provisions that prohibit or restrict the ability of an individual who is a party to the form contract to engage in a covered communication.

126.   Defendants have thereby violated the CRFA, 15 U.S.C. § 45b(c).

## COUNT EIGHT

### Relief Defendant

127.   Relief Defendant Peregrine Worldwide LLC has received, directly or indirectly, funds or other assets from Defendants that are traceable to funds obtained from Defendants' purchasers through unfair or deceptive acts or practices described herein.

128.   Relief Defendant Peregrine Worldwide LLC is not a bona fide purchaser with legal and equitable title to Defendants' purchasers' funds or other assets, and Relief Defendant will be unjustly enriched if it is not required to disgorge the funds or the value of the benefit it received as a result of Defendants' unfair or deceptive acts or practices.

129.   By reason of the foregoing, Relief Defendant holds funds and assets in constructive trust for the benefit of Defendants' purchasers.

## CONSUMER INJURY

Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the Business Opportunity Rule, and the Consumer Review Fairness Act. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act, the Business Opportunity Rule, and the Consumer Review Fairness Act by Defendants in accordance with Section 13(b) of the FTC Act, 15 U.S.C. § 53(b);

B.     Grant preliminary injunctive and ancillary relief;

C.     Award monetary and other relief within the Court's power to grant in accordance with Section 19 of the FTC Act, 15 U.S.C. § 57b;

D.     Enter an order against Relief Defendant awarding monetary and other relief, but not injunctive relief; and

E.     Award Plaintiff such other and additional relief the Court may determine to be just and proper.

Respectfully submitted,

Dated:  August 8, 2023

Colleen Robbins
Christopher E. Brown
Federal Trade Commission
600 Pennsylvania Ave., NW, CC-8528
Washington, DC 20580
(202) 326-2548; crobbins@ftc.gov
(202) 326-2825; cbrown3@ftc.gov
(202) 326-3395 (fax)

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION