## DECLARATION OF CHRISTINE RODRIGUEZ
### Pursuant to 28 U.S.C. § 1746

I, Christine Rodriguez, have personal knowledge of the facts and matters set forth below.  If called as a witness, I could and would testify as follows:

1. My name is Christine Rodriguez.  I am over the age of 18 and reside in Miami, Florida.

2. In early 2021, I was on Instagram and saw an investment opportunity for an automated, managed, ecommerce store on the Walmart marketplace on an Instagram page for a company called Empire Ecommerce ("Empire").  I followed this account and learned that Empire had substantial experience running ecommerce stores and this opportunity was an easy and profitable model for passive income.  The advertising also said that Empire was the only ecommerce automation service backed by a Venture Capital Firm—Palenea Ventures.

3. I discovered that John and Roman Cresto owned Empire, and I started following their accounts on Instagram.  I also visited Empire's website.  On these Instagram pages and website, I saw positive client testimonials, profit projections, statements about making large profits and lists of services Empire offers.

4. I spent about 4 months following Empire and the Crestos' Instagram pages and decided to request a consultation call.  I sent a message through Instagram to Roman Cresto expressing my interest in a Walmart Store.  At first I spoke with Roman and John Cresto, but then I just spoke with John.  John Cresto was the VP of Sales for Empire.  On these calls, I learned about their services, the process of opening a third-party seller store, their job of running the stores, and how much passive income I could make.  All I had to do was send a management fee, fill out onboarding documents, set up my own LLC, and Empire would handle the rest.

5. John also sent me a Walmart Automation Opportunity powerpoint deck.  The powerpoint

PX7
000316

is titled, "Walmart Automation By Empire Ecommerce." Attached as **Attachment A** is a true and correct copy of the powerpoint deck. **Attachment A** is referenced throughout paragraphs 6-11.

6. Empire promised to help set up a Walmart ecommerce store for me, research products, process and fulfill orders, and handle customer service needs. One powerpoint slide said, "**[o]ur team of Ecommerce experts have done millions in automation sales with hundred [sic] of happy clients**."

7. It was my understanding that Empire used the dropshipping business model, labeled Fulfillment by Merchant ("FBM"). In my experience with Empire, this model means they would list items for sale in their clients' Walmart stores and only buy inventory from their suppliers to fulfill the sales made on the stores they managed.

8. Empire claimed in their advertising and powerpoint provided to me that they have made their current clients over $10M+ with Walmart Automation. It also claimed that the profit margins are 15-30% selling on Walmart while only 10-15% selling on Amazon.

9. The powerpoint deck also contained several slides regarding sales projections and screenshots of what appeared to be sellers' stores. In month 1, the projected monthly gross sales are $4,000-$8,000 with a profit margin of $600-$1200. In months 2-4, the projected monthly gross sales are $8,000 to $12,000 with a profit margin of $1400 to $3600. In months 4-8, the projected monthly gross sales are $15,000 to $25,000 with a profit margin of $2,250 to $7500. By months 8-12, the projected monthly gross sales are $40,000 -$55,000 with a profit margin of $6,000-$16,500.

10. According to the information I was provided, Empire charged $35,000 to $55,000 for a new Walmart ecommerce store with a monthly profit split of 55/45; 55% for the client and 45%

**PX7**
**000317**

for Empire.  On top of the fee, I was told clients had to have access to working capital; $15,000-$20,000 monthly for the first 3 months and $20,000 - $40,000 monthly after 3 months.  The onboarding process was supposed to take 4-8 weeks.

11.   Although I did not participate in the Affiliate program, I was informed that Empire also offered an affiliate program.  Based on the powerpoint slides, an affiliate could earn $5,000 for every client the affiliate brings to Empire and who ultimately sets up a store with Empire.  If the

affiliate is responsible for the creation of over 45 stores, he or she could earn up to $10,000 per store.

12.   I also spoke with John and Roman Cresto over the phone and they repeated some of the claims that I had seen on Roman's Instagram posts.  The Crestos said: (1) Empire had experience scaling hundreds of e-commerce stores on the Amazon and Walmart marketplace for clients, and that hundreds of these stores were running profitably; (2) profits were made using the dropshipping method; (3) profit margins were between 8-20%; (4) Walmart was a better ecommerce marketplace than Amazon with higher profit margins; 15-30% for Walmart vs.  10-15% for Amazon, and Walmart had a lower chance of account health or suspension issues; (5) the Crestos had expertise managing stores to avoid the risk of suspension and that they had an insider to streamline getting stores approved and reinstated; and (6) Empire was providing an opportunity to generate passive income and they expected I would receive a return on investment (ROI) within 12-18 months.

13.   Empire offered several options to me.  I could buy a new store, I could buy multiple new stores, or I could buy an aged store; a store that was dormant but had a history of sales.  These various options had different price points.

3

14.  I decided to purchase one new store and I received a Dropshipping Service Agreement to purchase my Walmart store.  The agreement was between me and Onyx Distribution LLC ("Onyx").  I understood that Empire was a dba for Onyx.  In fact, the initial profit split invoice I received was from Empire.  Under the agreement, I had to provide a means of credit so that Empire could fulfill customer orders on my store.  According to the agreement, in exchange for $35,000 and a 55/45% profit split, Empire was supposed to: (1) research products to be listed in my Walmart store; (2) list those products in my store; (3) process orders by Walmart's store customers, including purchase and fulfillment through delivery; (4) respond to reasonable customer service needs related to Walmart store customers; (5) handle negative feedback removal requests; (6) manage my Walmart's store sales metrics; and (7) compile and send sales sheets to me.  In addition, I was also going to be responsible for additional onboarding fees ranging from $800-$1400 and a $200 monthly management fee.  The onboarding fees included things like Walmart commission fees, business expenses, such as opening an LLC and opening a virtual office, and sales tax related fees.  Roman Cresto signed the agreement as CEO of Onyx Distribution LLC on August 17, 2021.  Attached as **Attachment B** is a true and correct copy of the signed agreement.

15.  I wired $35,000 to Onyx after I signed the agreement.  The main reason why I signed up was because the company advertised it was backed by a venture capitalist firm.  It turns out that firm is run by Andrew Chapman who I learned also worked for Empire as CFO.  Also, I signed up because of their advertising that I could make passive income and generate income every month.  I also liked the fact that the Crestos told me they would run the store for me, hire virtual assistants from overseas, buy the inventory from their suppliers, and that I would make passive profit.

4

16.   I never received any document from Empire or Onyx with any information substantiating their earning and profit claims contained in their advertisements, powerpoint deck, or over the phone with John or Roman.  I also never received a document from Empire or Onyx telling me whether the company has been subject to legal action or a list of consumers who purchased their services in the past 3 years.

17.   Initially I opened an LLC, opened a virtual office, obtained a Tax ID number, and went through the onboarding process.  But then I had to wait for Walmart to approve me.  That process took several months.  After a lot of back and forth with Empire as to why there was such a delay in my store's launch, my store finally went live in approximately November 2021, but soon after it was up and running, it was deactivated in January 2022 because of violations of Walmart's policies.  I did not make any profit in that time-period.

18.   After seeking answers about my store's deactivation which I never received, Empire convinced me to switch to an Amazon store in February 2022.  I was given a powerpoint deck on that business opportunity as well.  The powerpoint said that I would become "a silent partner" with Empire "on a 6 figure per month" Amazon business that I would own while Empire does all the work.  This opportunity also used the dropshipping model.  The start-up fee was $35,000 for a new store, $500 monthly fee for the first 3 months and then a monthly profit split started on month 4 with a 65/35% profit split.  Aged stores cost $45,000-$55,000.  The working capital requirements ranged from $20,000-$50,000.  This powerpoint also included expected store growth, case studies, and customer testimonials.  Attached as **Attachment C** is a true and correct copy of this powerpoint.

PX7
000320

19.  In March 2022, I signed a new agreement that looked virtually identical to the first agreement.  Roman Cresto signed as CEO of Onyx Distribution LLC.  I did not have to pay an additional fee for this store.  Attached as **Attachment D** is a true and correct copy of this agreement.

20.  My new store opened in March 2022, but the store was put on "vacation mode" which meant that it was not operating.  When I questioned Empire about the "vacation mode," I was vaguely told by customer service that Empire was going through an internal overhaul.  I received an email from Empire about the pause in May 2022 stating that my store should be up and running in the next 30 days.  The store launched in June 2022 and was suspended by Amazon on August 18, 2022 for violations of their policies.  During the time the store was opened, I noticed that customers were making a lot of returns, and I was eating most of the costs of the returns.  Any money I did make from sales went straight to pay for inventory or other fees.  For both my Walmart and Amazon stores, I opened business lines of credit to pay for the inventory.  In addition, I noticed listings that were removed for incorrect descriptions, orders that were unfulfilled, or violations of intellectual property.  Empire completely mismanaged my store even though it claimed to be an expert in this field.  The most egregious of all violations is the fact that the sales on my Amazon store were all fulfilled by Walmart.  Although Empire claimed to use different suppliers as they should have done, they put my store at risk by using another competing retailer to fulfill my orders and dropship directly to the end customer.  Empire even advertised in a post that they purposely stay away from only using retail suppliers like Walmart to avoid suspensions.  Yet, all of the orders in my store were fulfilled by one retailer, Walmart.  Based on my limited understanding and research, Empire was supposed to use wholesalers to fulfill the orders to avoid suspensions.

PX7
000321

21.  Even before my store was deactivated, I sent emails complaining to customer service and demanded to speak with someone in Management about what I was discovering on my store. I spoke with Jacob Faust and explained the situation.  I told him I had $3400 in losses for August alone because of all the refunds, where customers would demand refunds from Amazon, but not return the product.  Jacob told me he could not help me because he was blocked by Amazon from information about my store, but many of my concerns were about Empire's handling of customer orders.  We emailed for several weeks and in September 2022, I told him that my store had been suspended for nearly one month and I still had no idea why it was suspended.  I reminded him that I have had two stores now and two suspensions within 60 days of each store's opening.  I also mentioned that I had to pay $10,000 in minimum payments for the business credit lines I opened to pay for the inventory.  Attached as **Attachment E** is a true and correct copy of the email string. When I logged into my Amazon account, I saw that Empire had indeed submitted an appeal but, in that appeal that they submitted on my behalf without my approving it or even seeing a draft, I discovered that whoever drafted it admitted to all of the mismanaging of the account in an effort to appease Amazon.  Yet, no one at Empire ever took responsibility for the mismanagement. Empire knew that they had violated Amazon policy and in my view, they were playing the system. I also learned during this time that Appeal Ninja, a Nevada company founded by Andrew Chapman, was an insider, and not a third-party company, submitting the appeals for Empire.

22.  I ultimately spoke with Roman Cresto in September 2022, and he offered to switch me into an Amazon FBA store.  FBA means "Fulfilled by Amazon."  I was told that this is different from dropshipping because with FBA I would need to order inventory ahead of time.  The inventory is purchased and sent to Amazon's warehouse where it is packaged and sent out once

PX7
000322

orders are placed.  He told me that this was my only option because the dropshipping model was not viable for me.  I thought about the offer but decided against it.

23.   On September 20, 2022 I emailed Roman Cresto to tell him that I was declining his offer.  I told him, "You can imagine how incredibly distressed I am at this juncture given that my store was active for 60 days after waiting almost a year to get going! This is not what I was promised and this not what Empire markets to the public about its services.  You represent that you are the experts in this field.  Unfortunately, this has not been my experience with your company."  I also told him, "You are essentially asking me to give Empire a third chance to make good on my investment.  As I explained to you, I am in the red after 13 months, and not even at break even."  I went on to tell him that the amount of returns and refunds due to late deliveries, incorrect product received, and refunds cost me over $4000.  I said, "I am operating at a loss even if I get Amazon to disburse my funds because I owe more on my lines that what I will be getting from Amazon."  I also told him that despite his claim that this was going to create passive income, this was no passive investment as I spent countless hours reconciling my account, reviewing refunds and returns, and reviewing my store statistics.

24.   A few days later, I sent another email to Roman and stated, "[e]very day is another loss to me because I'm paying interest on my lines.  Every day as my store sits in suspension mode I see refunds and return requests coming in.  As I mentioned even when I get the money from Amazon I will have a negative balance and I will have to supplement my lines."  I also mentioned that I noticed Empire continues to market its efficiency with overturning suspensions with respect to Amazon's policies, but that "my store is still sitting in suspension after five weeks so how can that be."  I finally noted that, "I have a family and this is causing huge financial distress for everyone in my household."

PX7
000323

25.  Roman emailed me back on September 23 and told me that he could move me into another dropshipping store but FBA would be better.  He also offered to refund me $7500 even though I had asked for a refund of $32,500.  I emailed him and told him that rather than switching me to another store, I would like to know why my store was still suspended after five weeks when they advertise they are experts at undoing suspensions quickly.  I also said, "my experience with Empire has not at all been in-line with what you market or what the contract for FBM I signed said it would be."  I told Roman, "How can you not look at my situation and arrive at the conclusion that my store was run beyond inefficiently?  Just look at the returns.  Look at the refunds.  Look at the nature of the messages and look at the sales sheet.  I'm in the red."  I then asked for a refund of $30,000.  Roman responded with 3 options for me: (1) $7500 refund; (2) work on an appeal and set up another dropshipping store; or (3) work on an appeal and set up an FBA store.  Attached as **Attachment F** is a true and correct copy of the email string discussed in paragraphs 23-25.

26.  I joined a private Facebook group of other Empire clients and to date there are approximately 221 clients of Empire's business opportunities in the Facebook group.  Many have self-identified as victims in a spreadsheet.  Any new member who joins can include their information into the spreadsheet.  I made a copy of the spreadsheet in December 2022 and at that time there were approximately 113 clients with an estimated loss of over $7 million.  Attached as **Attachment G** is a true and correct copy of a redacted spreadsheet containing many of these clients.

27.  I paid Empire $35,000 and had additional start-up costs of approximately $3,000.  In 2021 I had $14,855 in gross sales from my Walmart store.  However, after subtracting my initial fee, Walmart fees, inventory payments, customer refunds, loan fees and interest, and onboarding

PX7
000324

and operating costs, I had a total loss in 2021 of $39,874.19.  In 2022, I had $93,871 in total gross

sales from both my Walmart and Amazon stores, but I lost $16,127 of that to customer refunds.

Then, after deducting Walmart and Amazon fees, loan interest and fees, operating costs, inventory

payments, legal fees, virtual office fees and insurance premiums, I had a total loss of $9,600.00 in

2022.  I have not made the amount of money that was on the powerpoint deck I reviewed before I

purchased the store.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on: ___March 21_____, 2023          _____
Miami, Florida                                                          Christine Rodriguez

PX7
000325



# *Walmart Automation*
## *By Empire Ecommerce*

Attachment A

*Any monthly earnings, revenue, or profit discussed/shown in this document is in no way legally guaranteed and is just for explanation purposes. Confidential and Proprietary. Copyright by Empire Ecommerce, LLC. 2021. All Rights Reserved.

PX7
000326

## *What is Walmart Automation*

- With Walmart Automation, we help you setup your Walmart ecommerce store - an online marketplace dedicated to selling Walmart approved products.

- Our team of Ecommerce experts constantly research and analyze the hottest product trends to ensure your store generates the highest sales volumes.

- We then process and fulfill orders, and handle all customer service needs.

- Our automation service is our secret sauce -  building customer traction and marketplace relevance. We build value in our customer's ecommerce stores while increasing their passive income over time.

- Our team of Ecommerce experts have done millions in automation sales with hundred of happy clients.

Attachment A

*Any monthly earnings, revenue, or profit discussed/shown in this document is in no way legally guaranteed and is just for explanation purposes.
Confidential and Proprietary. Copyright by Empire Ecommerce, LLC. 2021. All Rights Reserved.

PX7
000327

# *What is Walmart Dropshipping*

- We use the **Dropshipping business model** - we list items for sale on your Walmart store and ONLY **buy inventory** from our suppliers **after we make sales** on your store.

- This means there's **no risk of buying inventory upfront** and waiting for a sale.

- You never see or touch the items you're selling. The suppliers do all the shipping for you.

Attachment A

*Any monthly earnings, revenue, or profit discussed/shown in this document is in no way legally guaranteed and is just for explanation purposes.
Confidential and Proprietary. Copyright by Empire Ecommerce, LLC. 2021. All Rights Reserved.

PX7
000328

## *Walmart vs Amazon*

- Walmart just started scaling its marketplace to directly compete with Amazon - an established marketplace where we have made our current clients over $10M+. This makes selling on Walmart's ecommerce marketplace a prime market entry point to build an ecommerce store.

- Walmart has a much lower chance of account health issues or account suspension issues.

- Profit Margins are higher on walmart: 15-30% vs 10-15% on selling on Amazon.

Attachment A

*Any monthly earnings, revenue, or profit discussed/shown in this document is in no way legally guaranteed and is just for explanation purposes.
Confidential and Proprietary. Copyright by Empire Ecommerce, LLC. 2021. All Rights Reserved.

PX7
000329

# Sales Projections

| Month | Gross Sales | Profit Margin | ROI Percentage |
|---|---|---|---|
| Month 1 | $4,000 to $8,000 | $600 to $1,200 | 15-30% |
| Month 2-4 | $8,000 to $12,000 | $1,400 to $3,600 | 15-30% |
| Month 4-8 | $15,000 to $25,000 | $2,250 to $7,500 | 15-30% |
| Month 8-12 | $40,000 to $55,000 | $6,000 to $16,500 | 15-30% |
| Month 12+ | $70,000 to $90,000 | $10,000 to $27,800 | 15-30% |
| Month 15+ | $100,000+ | $15,000 to $30,000 | 15-30% |

Attachment A

*Any monthly earnings, revenue, or profit discussed/shown in this document is in no way legally guaranteed and is just for explanation purposes.
Confidential and Proprietary. Copyright by Empire Ecommerce, LLC. 2021. All Rights Reserved.

PX7
000330



*Any monthly earnings, revenue, or profit discussed/shown in this document is in no way legally guaranteed and is just for explanation purposes.
Confidential and Proprietary. Copyright by Empire Ecommerce, LLC. 2021. All Rights Reserved.

**PX7**
**000331**



# *Month 4-6 Sales Projections*

### *$18,900 in sales per month*

### *$17,100 in sales per month*





Attachment A

*Any monthly earnings, revenue, or profit discussed/shown in this document is in no way legally guaranteed and is just for explanation purposes.
Confidential and Proprietary. Copyright by Empire Ecommerce, LLC. 2021. All Rights Reserved.

PX7
000333

# *Month 7-11 Sales Projections*

### *$67,400 in sales per month*

### *$70,800 in sales per month*





Attachment A

*Any monthly earnings, revenue, or profit discussed/shown in this document is in no way legally guaranteed and is just for explanation purposes.
Confidential and Proprietary. Copyright by Empire Ecommerce, LLC. 2021. All Rights Reserved.

PX7
000334

## Month 12-15+ Sales Projections



**Higher sales revenue stores result from built up history and trust with Walmart.**

**Walmart promotes these stores over new ones if the store has a history of good customer service and top tier fulfillment metrics.**

*Any monthly earnings, revenue, or profit discussed/shown in this document is in no way legally guaranteed and is just for explanation purposes.
Confidential and Proprietary. Copyright by Empire Ecommerce, LLC. 2021. All Rights Reserved.

## *Cost Breakdown*

**$35,000 - $55,000 - New Walmart Ecommerce Store**

**Monthly Profit Split:**

**55% (Client) - Owner Income**

**45% (Empire Ecommerce Team) - Operating Expense**

Attachment A

*Any monthly earnings, revenue, or profit discussed/shown in this document is in no way legally guaranteed and is just for explanation purposes.
Confidential and Proprietary. Copyright by Empire Ecommerce, LLC. 2021. All Rights Reserved.

PX7
000336

# Recommended Working Capital / Credit Totals

**First 3 months - access to $15k to $20k (estimated monthly)**

**After 3 months - access to $20k- $40k in credit lines (estimated monthly)**

## Estimated Onboarding Time:

**4 to 8 weeks**

Attachment A

*Any monthly earnings, revenue, or profit discussed/shown in this document is in no way legally guaranteed and is just for explanation purposes.
Confidential and Proprietary. Copyright by Empire Ecommerce, LLC. 2021. All Rights Reserved.

# Affiliate Program

**Refer a customer and make up to $10k per store**

**Affiliate Commission Payout Structure:**

**$5000 for every store you bring to us up to the first 15 stores**

**$7000 (per store) for stores 16 - 30**

**$8500 (per store) for stores 31 - 45**

**$10,000 (per store) for stores over 45**

Attachment A

*Any monthly earnings, revenue, or profit discussed/shown in this document is in no way legally guaranteed and is just for explanation purposes.
Confidential and Proprietary. Copyright by Empire Ecommerce, LLC. 2021. All Rights Reserved.

**PX7
000338**

# READY TO GO!

CLICK THE "**GET STARTED**" BUTTON &

# WELCOME TO THE EMPIRE FAMILY!



Attachment A

*Any monthly earnings, revenue, or profit discussed/shown in this document is in no way legally guaranteed and is just for explanation purposes.
Confidential and Proprietary. Copyright by Empire Ecommerce, LLC. 2021. All Rights Reserved.

PX7
000339

DocuSign Envelope ID: 3B65C6A2-4F33-4585-AF41-BFC3B36696E5

## DROPSHIPPING SERVICE AGREEMENT

This Dropshipping Service Agreement ("**Agreement**"), dated and effective as of (the "**Effective Date**"), is entered into between Onyx Distribution LLC ("**Service Provider**") and ___Christine Rodriguez___ ("**Client**"). Service Provider and Client may each be referred to herein as a "**Party**" and together as the "**Parties**."

1.   Purpose; Scope of Services.

    a)   This Agreement establishes the general terms and conditions pursuant to which Service Provider will provide Walmart dropshipping e-commerce management, consulting, and related services ("**Services**") to Client, which the Parties enter under this Agreement.

    b)   This Agreement entered into and agreed upon by the Parties shall be deemed effective, if and when signed by the Parties, whether physically or electronically. Any conflict between the Parties shall be resolved under the provisions of this Agreement.

    c)   Subject to Client's timely cooperation in accordance with Section 2(a), Service Provider shall use commercially reasonable efforts to perform the Services in accordance with the terms set forth in this Agreement. Without limiting the generality of the foregoing, Service Provider shall not be liable to Client for any failure or delay in any performance of the Services caused by events beyond Service Provider's control, including, without limitation, any force majeure, Client's failure to furnish necessary information on timely manner or otherwise reasonably cooperate with Service Provider, any failure or delays in transportation or communication, failures or substitutions of software, programs or equipment, any restrictions on access to Client information or facilities, technical failures, actions by third-party platforms and marketplaces, changes in law, failure by Client to timely complete tasks required of Client or in otherwise performing Client's obligations hereunder or any incorrect or untrue facts, assumptions, representations or statements made or conveyed to Service Provider. Client understands and hereby acknowledges that any such delays or failures or actions by third parties that are beyond Service Provider's control, may result in additional charges to Client for the Services. Additional charges will be for the benefit of the Client's business.

    d)   Client understands and hereby acknowledges that nothing in this Agreement establishes exclusivity on the part of Service Provider to provide Services to the Client. Service Provider shall have the right to provide, the same or similar Services to third parties, including third parties who may be competitors of Client, at any time during the Term of this Agreement and after its termination. Client also understands and hereby acknowledges that the Dropshipping business model is against Terms of Service of some marketplace platforms, e.g., Amazon, and carries inherent risks including but not limited to Walmart account suspension and funds being on hold and other risks. Due to the nature of high volatility of changes in the industry, retailers are rotated based on risk within the industry. Client acknowledges that utilizing unauthorized supply chains carry possible risk of IP complaints, and suspensions for the first 6 months or beyond. It is necessary to purchase inventory for new seller accounts to prepare the accounts for possible supply chain suspension. Thus, the Client is educated and acknowledges the possible outcomes of the business model and holds Service Provider harmless in such cases. In the case of IP complaints, there shall be recommendations for lawyers to reinstate the account or to pursue legal action against brands if the IP complaint is baseless.

1

**Attachment B**

PX7

000340

DocuSign Envelope ID: 3B65C6A2-4F33-4585-AF41-BFC3B36696E5

2.   <u>Client's Responsibilities</u>.

a)  <u>Client shall</u>:

    i.   Timely provide copies of or access to Client's information, documents, samples, products or such other information and   materials (collectively, "**Client Materials**") as Service Provider may reasonably request or require in order to carry out the Services.

    ii.   Ensure that any Client Materials are permitted to be shared with Service Provider and are complete and accurate in all respects. Client and its licensors, if any, shall at all times remain the sole and exclusive owner or licensee of all rights, title, and interest in and to Client Materials.

    iii.   Timely respond to any requests made by Service Provider or its representatives to provide direction, information, documents, approvals, authorizations or decisions that are reasonably requested by Service Provider in order to perform the Services contemplated by this Agreement.

    iv.   Timely appoint and, if requested by Service Provider in its reasonable discretion, replace a Client representative to serve as a point of contact with respect to the Services contemplated by this Agreement. Client shall be responsible for ensuring that any such representative has the appropriate authority to bind and act on behalf of Client with respect to the Services or other matters pertaining to this Agreement. Service Provider shall be entitled to fully rely upon the fact of any such appointment or replacement when taking any actions or not taking any actions with respect to the Services or other matters pertaining to this Agreement.

    v.   Timely sign documentation on opening accounts forms or other documents that need to be signed, as a normal part of operating the business.

    vi.   Fully educate themselves prior to purchasing inventory. Client will act as if they ordered the product and will give Service Provider permission to order product lines.

    vii.   Timely pay for operating expenses of the business which include but are not limited to placing inventory purchases, suspension insurance, general liability insurance (minimum 1 million dollars coverage), assigned workers expenses on store, any software expenses, and other operational costs that might be added.

    viii.   Timely pay monthly Operating Fee to Service Provider equal to <u>45   </u>% of monthly Operating Income. *See* Section 4(b).

    ix.   Timely pay monthly Management Fee to Service Provider of $200/month starting in the fifth month. *See* Section 4(c).

b)  Client is fully responsible for tax planning, paying for taxes, and filing taxes through a CPA or an accounting firm.

c)  Client understands that Service Provider is not an employee, and that this will be a collaborative, professional relationship of equals where mutual professional respect and courtesy are expected.

d)  Client understands the importance of communication and agrees to respond to requests and communications in a timely manner.

2

**Attachment B**

PX7

000341

DocuSign Envelope ID: 3B65C6A2-4F33-4585-AF41-BFC3B36696E5

e) Client understands that Service Provider has other Clients to serve, and requires fair, realistic notice in order to attend to requests. Poor planning on the part of Client will not constitute an emergency for Service Provider.

f) Client must maintain a credit card on file. If for any reason the card on file gets declined, or removed from the supplier website, it is of the utmost urgency that a replacement card be added to the supplier website as it puts your Walmart account at risk of shut down. This issue needs to be resolved within 24 hours. Service Provider is not liable for any account health issues related to the Walmart Seller account caused by the Client's failure to comply with the above request.

g) Client must have the necessary working capital (credit or cash) in order to grow their store in monthly sales.

3.   Service Provider's Responsibilities.

a)   Service Provider Shall Handle:

    i.   Research and development of product research.
    ii.   All product listings in your Walmart store done by the Service Provider.
    iii.   All order processing is taken care of by the Service Provider.
    iv.   Customer service needs taken care of by the Service Provider.
    v.   Return processing taken care of by the Service Provider.
    vi.   Negative feedback removal request taken care of by the Service Provider.
    vii.   Chargeback dispute taken care of by the Service Provider.
    viii.   Management of your Walmart store metrics.
    ix.   Receive sales sheets via email.

4.   Fees & Expenses; Taxes.

a) In consideration of the execution and delivery of this Agreement and the Services to be provided hereunder, Client shall pay to Service Provider an upfront, **Non-Refundable** payment ("**Base Fee**") in the amount of $ 35,000 , for each of 1_____ store(s), such amount to be payable within two (2) business days after the Effective Date in accordance with payment instructions to be provided to Client by Service Provider. Client understands and hereby acknowledges, however, that Service Provider may require additional upfront payments to be paid by Client under certain circumstances, including, without limitation, in the event the Parties agree to expand, amend or otherwise modify the Services (whether through an amendment or a newly-executed Agreement), which as a result, obligates Service Provider to provide Services to Client's business on mediums other than the Marketplace identified in the initial Agreement. **NOTE**: **Client will also be responsible for all onboarding costs associated with each store, which fall between $800 - 1,400. This amount depends on state LLC filing costs, virtual address fees, and various e-commerce platform subscription fees, for example, a Shopify Basic Plan.**

b) In consideration of the performance of Services by Service Provider, Client shall, in addition to the Base Fee, pay to Service Provider a monthly "**Operating Fee**" equal to 45___ % of Client's "**Operating Income**," as further defined and specified in section 4(d) for such Services. Client shall be solely responsible for the costs and expenses of maintaining and operating Client's business in accordance with the provisions of this Agreement, and shall pay all such costs and expenses as requested or required by Service Provider, to the extent contemplated by this

**Attachment B**

PX7
000342

DocuSign Envelope ID: 3B65C6A2-4F33-4585-AF41-BFC3B36696E5

Agreement or otherwise incurred in connection with the provision of Services by Service Provider, including but not limited to any costs and expenses resulting from any actions by third parties or changes or modifications in strategy or otherwise to the methodologies, vendors or resources initially used by Service Provider in connection with the provision of Services by Service Provider, to the extent that any such changes or modifications are reasonably required in the sole discretion of Service Provider.

c) In consideration of the performance of Services by Service Provider, and to support management services, Client shall, in addition to the Base Fee and Operating Fee, pay a monthly $200 "**Management Fee**." The fee shall not apply until the fifth (5) month of service, and shall continue thereafter.

d) As used herein, "**Operating Income**" means, for any given period, (x) the total Revenue for that period, less (y) the total Operating Expenses for that period. "**Revenue**" means, for any given period, the revenue generated in connection with the operation of Client's business in the Walmart Marketplace. Cashback rewards, credit card points or any other type of rewards generated during the business operation from a merchant/payment gateway/credit card company shall NOT be considered Revenue and shall not be counted as part of Profits or Operating Income generated. "**Operating Expenses**" means, for any given period, expenses incurred in connection with the operation of Client's business in the Walmart Marketplace, which shall be paid by the Client, and *for the purposes of calculating "Operating Income,"* shall be strictly limited to the following costs and expenses that Client approves, and is capable of monitoring:

    i.    Cost of goods from third-party vendors/suppliers that are supplying goods;
    ii.    Fees of third-party service providers needed to operate the business;
    iii.    Fees of account health protection, account reinstatement, other similar services that are provided by third party services;
    iv.    License or subscription fees for software used for accounting, forecasting, inventory management or similar purposes;
    v.    Packing, packaging, labeling or otherwise preparing goods or products to comply with requirements of the Walmart Marketplace as determined by Service Provider based upon Service Provider's experience and expertise;
    vi.    Assigned staff or Virtual Assistant costs related to operating the business; and
    vii.    Suspension insurance and general liability insurance.

*The Parties may, by mutual written agreement, amend this list for the purposes of determining Client's total "Operating Expenses" in any given period.*

e) Client acknowledges the nature of the business model carries the risk of Walmart account suspension and shall hold Service Provider harmless in such cases. It is in the sole discretion of the Service Provider to partner with third party companies as necessary to help with suspensions. For example, these companies will attempt to acquire Wholesale Suppliers to match the ASINs in question, and will work in cooperation with Service Provider to achieve account health. Client agrees to cooperate with third party companies and follow given instructions, purchase inventory and assist to facilitate the reinstatement process. Client agrees to pay the fees to third party companies if the suspension is due to the gross negligence of the Client and not the Service Provider.

f) Service Provider shall issue monthly invoices to Client specifying the fees that are then due and payable by Client, together with any other ancillary expenses that may apply in connection

4

**Attachment B**

**PX7**

**000343**

DocuSign Envelope ID: 3B65C6A2-4F33-4585-AF41-BFC3B36696E5

with the Services described in this Agreement. Client shall pay all invoiced amounts due to Service Provider within fifteen (15) calendar days of the date of transmission to Client of such an invoice.

g) Client shall pay interest on all late payments, calculated daily and compounded monthly at the lesser of the rate of one and one-half percent (1.5%) per month or the highest rate permissible under applicable law. Client shall also be required to reimburse Service Provider for all reasonable fees or costs incurred in connection with restoring or resuming any Services that have been suspended or disabled as a result of nonpayment by Client of invoiced amounts or otherwise in connection with pursuing or collecting any late payments, including, without limitation, attorneys' fees and fees charged by third party companies to reinstate the Walmart seller account. After thirty (30) calendar days of failure to pay invoices issued to Client, Service Provider shall pursue legal action against Client including actions by collection agencies to collect debt owed. Under such circumstances, Client will bear the cost for attorney fees and other expenses that occur during this pursuit to collect debt.

h) Client may dispute any invoiced amounts by giving written notice to Service Provider of the nature of Client's dispute by no later than the due date of the applicable invoice, provided that the related invoice is paid full on or before the due date. The Parties shall cooperate and work together in good faith to resolve any such disputes. All invoiced amounts previously paid for and successfully disputed by Client will be returned to Client in the form of a monetary credit applied to future invoices. For the avoidance of doubt, a pending dispute or credit does not and will not release Client from its obligation to pay all invoiced amounts in full when due.

i) All payments owed to Service Provider under this Agreement shall be made by Client via wire transfer, check, or other means directed by Service Provider.

j) Client shall be solely and exclusively responsible for paying any and all applicable federal, state or local sales, use, excise, privilege or other taxes or similar assessments or duties, however and by whomever designated or levied, relating to or in connection with any amounts payable by Client to Service Provider hereunder or in connection with any Services provided by Service Provider to Client pursuant hereto and any other similar amounts in lieu thereof that may be paid or payable by Service Provider, exclusive of taxes based on Service Provider's net income or net worth. Service Provider will invoice Client for any such amounts that are required to be collected by Service Provider pursuant to any applicable law, rule, regulation or other requirement.

5.   Intellectual Property; Data Privacy.

a) Subject to and in accordance with the terms and conditions of this Agreement, Client grants Service Provider and its affiliates or associates a limited, non-exclusive, royalty-free license during the Term of this Agreement to use Client's intellectual property rights to the extent necessary to provide the Services to Client.

b) The Client shall be solely and exclusively responsible, at all times with respect to the Client's business for which Service Provider is providing Services hereunder, for complying with any applicable the requirements of the EU General Data Protection Regulation ("**GDPR**") and other applicable data protection laws.

6.   Confidentiality.

**Attachment B**

PX7

000344

DocuSign Envelope ID: 3B65C6A2-4F33-4585-AF41-BFC3B36696E5

a) From time to time during the Term of this Agreement, either Party (as a "**Disclosing Party**") may disclose or make available to the other Party (as a "**Receiving Party**"), non-public, proprietary or confidential information and trade secrets of Disclosing Party ("**Confidential Information**"). If and to the extent that any such Disclosing Party wishes for any such Confidential Treatment to be protected as such pursuant to Section 6(b) hereof, such Confidential Information shall be clearly labeled or otherwise identified as "confidential" when disclosed or within five (5) calendar days thereafter. Confidential Information shall not include any information that:

    i.   is or becomes generally available to the public other than as a result of Receiving Party's disclosure;

    ii.  is or becomes available to the Receiving Party from a source other than Client, provided that such source is not and was not prohibited from disclosing such Confidential Information to the Receiving Party;

    iii. was in Receiving Party's possession prior to Disclosing Party's disclosure to the Receiving Party; or

    iv.  was or is independently developed by a Receiving Party without using a Disclosing Party's other Confidential Information.

b) A Receiving Party shall:

    i.   protect and safeguard the confidentiality of the Disclosing Party's Confidential Information with at least the same degree of care as the Receiving Party would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care;

    ii.  not use the Disclosing Party's Confidential Information or permit it to be accessed or used, for any purpose other than to exercise its rights or perform its obligations under this Agreement; and

    iii. not disclose any such Confidential Information to any person or entity, except to employees or other members of the Receiving Party's affiliates, associates, group, employees, subcontractors, vendors, service providers or other staff who need to know the Confidential Information to assist the Receiving Party or act on its behalf, to exercise its rights or perform its obligations under this Agreement.

c) Notwithstanding anything to the contrary contained in this Section 6 or elsewhere in this Agreement, if a Receiving Party reasonably believes that such Receiving Party is required by applicable law or legal process to disclose any Confidential Information, it may do so; provided, however, that prior to making such disclosure, such Receiving Party shall use reasonable efforts to notify Disclosing Party reasonably in advance of such disclosure so as to afford Disclosing Party the meaningful opportunity to pursue, at Disclosing Party's sole cost and expense, protection from disclosure.

d) Notwithstanding anything to the contrary contained in this Section 6 or elsewhere in this Agreement, Client shall keep this Agreement and the terms thereof, including Service Provider's business practices, trade secrets, commercial methodologies, and other internal processes strictly confidential and shall not disclose them to any third parties without the prior written authorization of Service Provider, with the exception of: (i) Client's legal and tax advisors or (ii) to the extent required by law. Any form of public or private, oral or written defamation, slander, traducement, malicious misinterpretation of facts and events by the Client regarding the Service Provider, whether after the effective date of this Agreement or after its Termination, shall be treated as grounds of breach of contract and/or shall result in legal actions taken by Service Provider against Client.

6

**Attachment B**

PX7

000345

DocuSign Envelope ID: 3B65C6A2-4F33-4585-AF41-BFC3B36696E5

7.     Term.

   a)  The term of this Agreement shall commence on the Effective Date and continue for 12 months thereafter (the "**Term**") unless and until terminated pursuant to Section 8.

   b)  Agreement shall automatically renew every 12 months, and if Client has achieved a 100% ROI during the prior 12-month period, Client shall pay a renewal fee to Service Provider of $5,000.00.

8.     Termination; Effect of Termination.

   a)  Termination without Cause. Any Party may terminate this Agreement at any time without cause, unilaterally, upon thirty (30) calendar days' written notice to the other Party. If Client initiates termination unilaterally without cause, Client shall either sell the ecommerce business to the Service Provider at a mutually agreed price, sell it to a third party pursuant to Section 8(c), or transfer service to another service provider at a mutually agreed price pursuant to Section 8(f).

   b)  Termination for Cause. Any Party may terminate this Agreement, effective immediately upon written notice to the other Party (the "**Defaulting Party**"), if the Defaulting Party materially breaches this agreement, and such breach is incapable of cure or, with respect to a material breach capable of cure, if the Defaulting Party does not cure such breach within thirty (30) calendar days after receipt of written notice of such breach. Notwithstanding anything to the contrary under this Section 8(b), Service Provider may immediately suspend or disable the provision of any Services to Client if Client fails to timely pay in full any invoiced amounts when due hereunder, and upon written notice to Client may terminate this Agreement effective immediately if Client fails to fully cure, to the Service Provider's satisfaction, such non-payment within fifteen (15) calendar days after receipt of written notice of such non-payment.

   c)  Termination upon Change of Control. Client shall not be allowed to initiate or allow any form of change of ownership or control of the ecommerce business without the written consent of Service Provider. Client shall promptly notify Service Provider in writing of any anticipated or proposed "**Change of Control Event**" (as defined below) as soon as practicable prior to the occurrence of such Change of Control Event. Upon receipt of such notice, Service Provider shall have the option, but not the obligation, to terminate this Agreement with immediate effect upon written notice to Client of its election to terminate this Agreement.

In any Change of Control Event, the Service Provider is entitled to:

   i.   Approval of the price paid to Client for said Change of Control event; and
   ii.  A mutually agreed upon percentage of the sale price.

"Change of Control Event" means the occurrence of any one or more of the following:

   i.   any sale, transfer or exchange of all or substantially all of the assets of the Client's business in one transaction or a series of related transactions;
   ii.  any sale, transfer, disposition, merger, consolidation, reorganization or combination of Client with, by, to or into any other company, entity or person, which would result in a change or transfer (whether in a single transaction or a series of related transactions) of

7

**Attachment B**

DocuSign Envelope ID: 3B65C6A2-4F33-4585-AF41-BFC3B36696E5

the ownership of more than fifty percent (50%) of the voting capital stock, membership, partnership or other similar equity interests or rights in the Client; or

    iii.    any acquisition (whether in a single transaction or a series of related transactions) of the power to direct or cause the direction of, the Client's management, decisions or policies, whether through the ownership of voting equity interests, by contract or otherwise. Client is not allowed to remove Walmart account's "User Permissions" of Service Provider and such an action shall be regarded as a Change of Control Event and shall result in the same consequences as other Change of Control Events described above.

d) <u>Termination for Insolvency Matters</u>. Any Party may terminate this Agreement, effective immediately upon written notice to the other Party, if that other Party:
- i. becomes insolvent or admits its inability to pay its debts generally as they become due;
- ii. becomes subject, voluntarily or involuntarily, to any formal or informal proceeding under any domestic or foreign bankruptcy or insolvency law;
- iii. is dissolved or liquidated or takes any corporate action for such purpose;
- iv. makes a general assignment for the benefit of creditors; or
- v. has a receiver, trustee, custodian or similar agent appointed to take charge of or sell any material portion of its property or business.

e) <u>Effect of Termination</u>. Upon termination of this Agreement for any reason whatsoever under this Section 8, Client shall pay to Service Provider any and all amounts due to Service Provider and all outstanding work shall be deemed to have been terminated.

f) <u>Transition Services</u>. Client may request Service Provider to continue to perform certain Services and to assist with the transition of Client's business to a successor service provider or otherwise (collectively, "**Transition Services**"). After a written mutual consent between Parties, Service Provider can Transition Services to another Service Provider. This option becomes available after 6 months of the effective date of the start of this Agreement, on a case by case basis. If Service Provider accepts Client's request to Transition Services, the Parties shall negotiate in good faith mutually acceptable terms and conditions for the provision of Transition Services. The Client will not remove Walmart account's "User Permissions" of Service Provider unless and until the parties have come to an agreement such that removal is appropriate under the agreement.

9.    <u>Personnel</u>.

a) Service Provider will have sole responsibility for the assignment of personnel to perform any Services. Such personnel will not be restricted or prevented from performing similar services for others.

b) Service Provider may engage third parties to furnish services in connection with the Services in its sole discretion. In addition, Services may be performed by affiliates of Service Provider. No such engagement will relieve Service Provider from any of its obligations under this Agreement.

c) Client agrees not to attempt to establish a direct business or commercial relationship with the staff, affiliates, employees, and Virtual Assistants of Service Provider or offer them any form of employment. Any such attempts to circumvent Service Provider shall be treated as basis for breach of contract and immediate termination for cause and further legal action against Client.

10.    <u>Insurance</u>.

8

**Attachment B**

PX7

000347

DocuSign Envelope ID: 3B65C6A2-4F33-4585-AF41-BFC3B36696E5

a) During the Term of this Agreement, Client shall, at its own expense, maintain and carry insurance in full force and effect with financially sound and reputable insurers, of the types and with the coverage limits mentioned above. Insurance is optional, but highly recommended.

b) Upon Service Provider's request, Client shall provide Service Provider with a certificate of insurance from Client's insurer evidencing the insurance coverage specified in this Agreement. The certificate of insurance shall name Service Provider as an additional insured. Client shall provide Service Provider with sixty (60) calendar days' advance written notice in the event of a cancellation or material change in Client's insurance policy.

11.   No Other Representations or Warranties; Non-Reliance.

a) Service Provider represents and warrants that it shall perform the Services in a professional manner.

b) EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, (i) NEITHER THE SERVICE PROVIDER NOR ANY OTHER PERSON ON SERVICE PROVIDER'S BEHALF, HAS MADE OR MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, EITHER ORAL OR WRITTEN, WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE, TRADE OR OTHERWISE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED, AND (ii) CLIENT ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE SERVICE PROVIDER OR ANY OTHER PERSON ON SERVICE PROVIDER'S BEHALF, EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT.

12.   Indemnification; Limitation of Liability.

a) Parties shall indemnify, defend and hold each other and their directors, officers, agents, representatives, members, managers, employees, successors and assigns, harmless from and against any and all costs, damages, claims, suits, actions, liabilities, losses and judgments, including attorneys' fees, arising out of or relating to Parties' (i) access to or use of the Services, (ii) breach of any representation and warranty or any covenant under this Agreement or any Statement of Work, (iii) violation of GDPR requirements and (iv) negligence, fraud or willful misconduct, including the negligence, fraud or willful misconduct of the Parties' affiliates and representatives.

b) IN NO EVENT SHALL SERVICE PROVIDER BE LIABLE TO CLIENT OR TO ANY THIRD PARTY FOR ANY LOSS OF USE, REVENUE OR PROFIT OR LOSS OF DATA OR DIMINUTION IN VALUE OR FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER OR NOT SERVICE PROVIDER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE.

c) IN NO EVENT SHALL SERVICE PROVIDER'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY RELATED STATEMENT OF WORK,

**Attachment B**

PX7

000348

DocuSign Envelope ID: 3B65C6A2-4F33-4585-AF41-BFC3B36696E5

WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, EXCEED THE AGGREGATE AMOUNT PAID BY CLIENT TO SERVICE PROVIDER UNDER SECTION 4(A) FOR THE PORTION OF THE SERVICES GIVING RISE TO THE CLAIM.

d) Client shall bear (i) all collection risk (including, without limitation, credit card fraud and any other type of credit fraud) with respect to sales relating to Client's business and (ii) all responsibility and liability for the proper payment of all taxes or duties which may be levied or assessed (including, without limitation, sales taxes or duties) which may be levied in respect of sales relating to Client's business (iii) all credit risk including but not limited to credit cards and bank accounts closing due to high risk activity or interest rates increasing for Client's loans and Credit Card debt or any form of bank account or credit history damages.

e) Service Provider has no obligation to attempt to monitor or regulate the quality, suitability or content of any goods or products relating to Client's business and Client shall hold Service Provider harmless in the event of any claims relating to or arising from such goods or products. Client hereby represents and warrants to Service Provider that such goods or products will not infringe on or violate the intellectual property or other rights of any third party and will not contain any content which violates any applicable law, regulation or third-party rights.

f) Client understands and hereby acknowledges that there are inherent risks and uncertainties involved in the development and operation of Client's business as contemplated by this Agreement, and such risks and uncertainties form part of the business risk involved in the Client undertaking to obtain Services from Service Provider. Accordingly, Client hereby acknowledges that it is entering into this Agreement with full knowledge of such risks and uncertainties, and hereby also accepts such risks and uncertainties. Client further understands and hereby acknowledges that Service Provider has made no guarantee or representation and warranty regarding the success or performance of Client's business for which Service Provider is providing Services pursuant to this Agreement.

13. Miscellaneous.

a) Entire Agreement. This Agreement, including any related exhibits and schedules attached hereto, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

b) Notices. All notices, requests, consents, claims, demands, waivers, and other communications hereunder (each, a "**Notice**") shall be in writing and addressed to the Parties at the addresses set forth in the operative Statements of Work (or to such other address that may be designated by the receiving party from time to time in accordance with this Section 13(b)). All Notices shall be delivered by personal delivery; nationally recognized overnight courier (with all fees pre-paid); facsimile, e-mail, or other electronic delivery (with confirmation of transmission); or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only (i) upon receipt by the receiving Party, and (ii) if the Party giving the Notice has complied with the requirements of this Section 13(b).

**Notices Information:**

**Attachment B**

DocuSign Envelope ID: 3B65C6A2-4F33-4585-AF41-BFC3B36696E5

*If to Service Provider:*

| | |
|---|---|
| **Company Name:** | Onyx Distribution LLC |
| **Attn:** | Roman Cresto |
| **Address:** | ███████████████ <br> Encinitas, CA ███████ |
| **Email:** | sales@onyxdistributionco.com |
| **Phone:** | ██████████ |

*If to Client:*

| | |
|---|---|
| **Company Name:** | |
| **Attn:** | Christine Rodríguez |
| **Address:** | ███████████████ miami florida 33155 |
| **Email:** | ████████████ |
| **Phone:** | ██████ |

c) <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

d) <u>Amendment and Modification</u>. No amendment to or modification of this Agreement is effective unless it is in writing and signed by each Party.

e) <u>Waiver</u>. No waiver by either Party of any of the provisions hereof shall be effective unless explicitly set out in writing and signed by the Party so waiving. No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

f) <u>Assignment</u>. Client shall not assign, transfer, delegate or subcontract any of its rights or delegate any of its obligations under this Agreement without the prior written consent of Service Provider. Any purported assignment or delegation in violation of this Section 13(f) shall be null and void. No assignment or delegation shall relieve the Customer of any of its obligations under this Agreement. Service Provider may assign any of its rights or delegate any of its obligations to any affiliate or to any person acquiring all or substantially all of Service Provider's assets without

11

**Attachment B**

PX7

000350

DocuSign Envelope ID: 3B65C6A2-4F33-4585-AF41-BFC3B36696E5

Client's consent. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

g) <u>Choice of Law</u>. The validity, interpretation, construction and performance of this Agreement shall be governed by the internal laws of the State of California, without giving effect to any choice or conflict of law provisions or rules (whether in the State of California or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of California.

h) <u>Arbitration</u>. Any controversy or claim arising out of or relating to this Agreement or the breach thereof, shall be settled by binding arbitration administered by the American Arbitration Association in the State of California, County of San Diego in accordance with its Commercial Arbitration Rules. The prevailing Party in any such arbitration proceeding shall be entitled to an award of reasonable attorneys' fees and costs. Judgment on the award may be entered in the state and federal courts located in the State of California, County of San Diego, and the Parties hereby irrevocably consent to the exclusive jurisdiction of those courts for the purposes herein.

i) <u>Survival</u>. The rights and obligations of the Parties set forth in this Section 13(i) and in Sections 1(d), 5, 8, and 12 and any right or obligation of the parties in this Agreement which, by its nature, should survive termination of this Agreement, will survive any such termination this Agreement.

j) <u>Relationship of Parties</u>. Nothing in this Agreement creates any agency, joint venture, partnership or other form of joint enterprise, employment or fiduciary relationship between the Parties. Service Provider is an independent contractor pursuant to this Agreement. Neither Party has any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other Party or to bind the other Party to any contract, agreement or undertaking with any third party.

k) <u>Force Majeure</u>. Service Provider shall not be liable or responsible to Client, nor be deemed to have defaulted or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement when and to the extent such failure or delay is caused by or results from acts or circumstances beyond the reasonable control of Service Provider including, without limitation, acts of God, flood, fire, earthquake, explosion, governmental actions, war, invasion or hostilities (whether war is declared or not), terrorist threats or acts, riot or other civil unrest, national emergency, revolution, insurrection, epidemic, lock-outs, strikes or other labor disputes (whether or not relating to either Party's workforce) or restraints or delays affecting carriers or inability or delay in obtaining supplies of adequate or suitable materials, materials or telecommunication breakdown or power outage.

l) <u>Affiliate Referral</u>. If the Client was referred to the Service Provider by an Empire/Onyx Affiliate, previously registered and approved by the Service Provider, please provide his or her contact information below. The Affiliate listed will receive a referral fee per the structure outlined under the Service Provider's Affiliate Contract, which is an agreement separate from this Agreement. Please disregard 13(l) if you are not a new customer for the Service Provider.

**Affiliate Name:** _____

**Affiliate Phone Number:** _____

**Attachment B**

PX7
000351

DocuSign Envelope ID: 3B65C6A2-4F33-4585-AF41-BFC3B36696E5

**Affiliate Address:** _____

**Affiliate Email:** _____

**Attachment B**

PX7
000352

DocuSign Envelope ID: 3B65C6A2-4F33-4585-AF41-BFC3B36696E5

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the Effective Date.

**Company Name:**     Onyx Distribution LLC

**Signature:**

**Name:**     Roman Cresto

**Title:**     CEO

**Date:**     8/17/2021

**Company Name:**

**Signature:**

**Name:**     Christine Rodríguez

**Title:**

**Date:**     8/19/2021

14

**Attachment B**

PX7
000353



# *Amazon Automation: Dropshipping*

**Attachment C**

PX7
000354

# *Overview*

- You are essentially buying into a digital Amazon franchise and becoming a silent partner with us on a 6 figure per month* Amazon business that you own while we do all of the work.
- Our team of Ecommerce experts have done millions in sales on Amazon.com, and you get direct access to our proven system where we build out a store for you, find products to sell on your store, process and fulfill all of the orders and handle all of the customer service to make you a fully passive income every month selling basic items like coffee makers, kitchen utensils, workout equipment, and groceries on Amazon.com
- We use the Dropshipping business model where we list items for sale on your Amazon store first and then ONLY buy inventory from our suppliers after we make sales on your store. This means that there's no risk of buying inventory upfront and hoping it sells and also that you never see or touch the items you're selling because the suppliers do all the shipping for you.

Attachment C

PX7
000355

## *Cost Breakdown*

### Startup Cost (Franchise Fee):

$35,000 (New store)

$500 Monthly Fee For The First 3 Months

### Monthly Profit Split (Starts On Month 4):

65% (Client): 35% (Empire Ecommerce Team)

(For $45,000-55,000 Aged Accounts inquire within)

Attachment C

PX7
000356

*Expected Store Growth*

## 1 Week

| Sales Summary | | |
|---|---|---|
| Last updated 3/11/20 11:47:07 PM -07:00 | | |
| | Ordered product sales | Units |
| Today | $417.00 | 3 |
| 7 Days | $1,046.38 | 10 |
| 15 Days | $1,046.38 | 10 |
| 30 Days | $1,046.38 | 10 |
| View more of your sales statistics | | |

## 1 Month

| Sales Summary | | |
|---|---|---|
| Last updated 3/11/20 11:57:39 PM -07:00 | | |
| | Ordered product sales | Units |
| Today | $0.00 | 0 |
| 7 Days | $2,222.82 | 25 |
| 15 Days | $7,132.85 | 106 |
| 30 Days | $8,650.09 | 140 |
| View more of your sales statistics | | |

Attachment C

PX7
000357



PX7
000358







PX7
000361



PX7
000362



PX7
000363

# *Amazon Automation Client Interviews*

## *Salomon L: 120k Profit in 6 Months*
*https://vimeo.com/521580395*

## *Jonah K: 600k Sold in 4 Months*
*https://vimeo.com/521581086*

## *Clark L: 597k sold in 8 Months*
*https://vimeo.com/521581427*

## *Leon B: Making Full ROI on 2 stores in Less than 9 months*
*https://vimeo.com/521581540*

Attachment C

**PX7**
**000364**

**Working Capital Recommended (credit lines):**

20-40k, 50k+ for older stores

**Expected Onboarding Time:**

2-4 Weeks for New stores

4-6 weeks for Aged stores

*Any monthly earnings, revenue or profit discussed/shown in this document is in no way legally guaranteed and is just for explanation purposes.

Attachment C

DocuSign Envelope ID: 911749A2-00CA-4437-B4AF-B56B1D1D74D0

## DROPSHIPPING SERVICE AGREEMENT

This Dropshipping Service Agreement ("**Agreement**"), dated and effective as of (the "**Effective Date**"), is entered into between Onyx Distribution LLC ("**Service Provider**") and Christine Rodriguez ("**Client**"). Service Provider and Client may each be referred to herein as a "**Party**" and together as the "**Parties**."

1. <u>Purpose; Scope of Services</u>.

   a) This Agreement establishes the general terms and conditions pursuant to which Service Provider will provide Amazon dropshipping e-commerce management, consulting, and related services ("**Services**") to Client, which the Parties enter under this Agreement.

   b) This Agreement entered into and agreed upon by the Parties shall be deemed effective, if and when signed by the Parties, whether physically or electronically. Any conflict between the Parties shall be resolved under the provisions of this Agreement.

   c) Subject to Client's timely cooperation in accordance with Section 2(a), Service Provider shall use commercially reasonable efforts to perform the Services in accordance with the terms set forth in this Agreement. Without limiting the generality of the foregoing, Service Provider shall not be liable to Client for any failure or delay in any performance of the Services caused by events beyond Service Provider's control, including, without limitation, any force majeure, Client's failure to furnish necessary information on timely manner or otherwise reasonably cooperate with Service Provider, any failure or delays in transportation or communication, failures or substitutions of software, programs or equipment, any restrictions on access to Client information or facilities, technical failures, actions by third-party platforms and marketplaces, changes in law, failure by Client to timely complete tasks required of Client or in otherwise performing Client's obligations hereunder or any incorrect or untrue facts, assumptions, representations or statements made or conveyed to Service Provider. Client understands and hereby acknowledges that any such delays or failures or actions by third parties that are beyond Service Provider's control, may result in additional charges to Client for the Services. Additional charges will be for the benefit of the Client's business.

   d) Client understands and hereby acknowledges that nothing in this Agreement establishes exclusivity on the part of Service Provider to provide Services to the Client. Service Provider shall have the right to provide, the same or similar Services to third parties, including third parties who may be competitors of Client, at any time during the Term of this Agreement and after its termination. Client also understands and hereby acknowledges that the dropshipping business model is disallowed under the terms of service of some marketplace platforms and carries inherent risks in the event dropshipping becomes disallowed under the terms of service of the platform. Client acknowledges that utilizing unauthorized supply chains carry possible risk of complaints (including without limitation regarding intellectual property rights), and suspensions for the first 6 months or beyond. It is necessary to purchase inventory for new seller accounts to prepare the accounts for possible supply chain suspension.

1

**Attachment D**

**PX7**

**000366**

DocuSign Envelope ID: 911749A2-00CA-4437-B4AF-B56B1D1D74D0

2.      Client's Responsibilities.

    a)  Client shall:

        i.    Timely provide copies of or access to Client's information, documents, samples, products or such other information and materials (collectively, "**Client Materials**") as Service Provider may reasonably request or require in order to carry out the Services.

        ii.    Ensure that any Client Materials are permitted to be shared with Service Provider and are complete and accurate in all respects. Client and its licensors, if any, shall at all times remain the sole and exclusive owner or licensee of all rights, title, and interest in and to Client Materials.

        iii.    Timely respond to any requests made by Service Provider or its representatives to provide direction, information, documents, approvals, authorizations or decisions that are reasonably requested by Service Provider in order to perform the Services contemplated by this Agreement.

        iv.    Timely appoint and, if requested by Service Provider in its reasonable discretion, replace a Client representative to serve as a point of contact with respect to the Services contemplated by this Agreement. Client shall be responsible for ensuring that any such representative has the appropriate authority to bind and act on behalf of Client with respect to the Services or other matters pertaining to this Agreement. Service Provider shall be entitled to fully rely upon the fact of any such appointment or replacement when taking any actions or not taking any actions with respect to the Services or other matters pertaining to this Agreement.

        v.    Timely sign documentation on opening accounts forms or other documents that need to be signed, as a normal part of operating the business.

        vi.    Fully educate themselves prior to purchasing inventory. Under the dropshipping model, inventory correlates to the number of units of an item ordered by a customer through Client's store; bulk or non-ordered items will not be purchased and/or held as inventory. Client will act as if they ordered the product and will give Service Provider permission to order product lines.

        vii.    Timely pay for operating expenses of the business which include but are not limited to placing inventory purchases, suspension insurance, general liability insurance (minimum 1 million dollars coverage suggested), assigned workers expenses on store, and any software expenses.

        viii.    Timely pay monthly Operating Fee to Service Provider equal to <u>35</u> % of monthly Operating Income. *See* Section 4(b).

        ix.    Timely pay monthly Management Fee to Service Provider of $200/month starting in the fifth month. *See* Section 4(c).

    b)  Client is fully responsible for tax planning, paying for and filing all taxes relating to Client's business, including without limitation, income, payroll, sales, use, gross receipts, real estate, personal property or other taxes imposed in connection with Client's business.

    c)  Client understands that Service Provider is not an employee, and that this will be a collaborative, professional relationship of equals where mutual professional respect and courtesy are expected.

2

**Attachment D**

DocuSign Envelope ID: 911749A2-00CA-4437-B4AF-B56B1D1D74D0

d)   Client understands the importance of communication and agrees to respond to requests and communications in a timely manner.

e)   Client understands that Service Provider has other Clients to serve, and requires fair, realistic notice in order to attend to requests. Poor planning on the part of Client will not constitute an emergency for Service Provider.

f)   Client must maintain a credit card on file with all accounts set up during the onboarding process. If for any reason the card on file gets declined, or removed from a supplier website, it is of the utmost urgency that a replacement card be added to the supplier website as it puts Client's Amazon account at risk of shut down. This issue needs to be resolved within 24 hours. Service Provider is not responsible for monitoring whether a card remains on file, and Service Provider is not liable for any account health issues related to the Amazon Seller account caused by the Client's failure to comply with the above requirement that Client maintain a card on file.

g)   Client represents to Service Provider that it has, and covenants to Service Provider that it will maintain during the term of this Agreement, the necessary working capital (credit or cash) to grow Client's store in monthly sales, and will monitor his/her own credit accordingly. In no event shall Service Provider be responsible for Client credit card balances, including any fees or related expenses that might be incurred for lack of payment.

3.   Service Provider's Responsibilities.

a)   Service Provider Shall Handle the following matters, the scope of which will be further clarified via emails and other written materials that may be exchanged from time to time:

   i.     Research for products to be listed on the Amazon storefront.
   ii.    Listing selected products in Client's Amazon store.
   iii.   Processing orders by Amazon store customers, including purchase and fulfillment through delivery.
   iv.    Reasonable customer service needs related to Amazon store customers; responding to inquiries posted by Client during the onboarding process and after an Amazon storefront is running.
   v.     Return processing for Amazon store customers.
   vi.    Negative feedback removal requests.
   vii.   Management of Client's Amazon store metrics, i.e., tracking sales data.
   viii.  Compilation and sending of sales sheets to Client via email.

4.   Fees & Expenses; Taxes.

a)   In consideration of the execution and delivery of this Agreement and the Services to be provided hereunder, Client shall pay to Service Provider an upfront, **Non-Refundable** payment ("**Base Fee**") in the amount of $1.00____ for each of _x1 Amazon_____ store(s), such amount to be payable within two (2) business days after the Effective Date in

3

**Attachment D**

DocuSign Envelope ID: 911749A2-00CA-4437-B4AF-B56B1D1D74D0

accordance with payment instructions to be provided to Client by Service Provider. Client understands and hereby acknowledges, however, that Service Provider may require additional upfront payments to be paid by Client under certain circumstances, including, without limitation, in the event the Parties agree to expand, amend or otherwise modify the Services (whether through an amendment or a newly-executed Agreement), which as a result, may obligate Service Provider to provide Services to Client's business on mediums other than the marketplace identified in the initial Agreement. **NOTE**: **Client will also be responsible for all onboarding costs associated with each store, which fall between $800-1400. This amount depends on state LLC filing costs, virtual address fees, and various e-commerce platform subscription fees, for example, a Shopify Basic Plan.**

b) In consideration of the performance of Services by Service Provider, Client shall, in addition to the Base Fee, pay to Service Provider a monthly "**Operating Fee**" equal to _35_ % of Client's "**Operating Income**," as further defined and specified in section 4(d) for such Services. Service Provider shall use a portion of the Operating Fee to pay for the costs and expenses of maintaining and operating Client's business in accordance with the provisions of this Agreement, and shall pay all such costs and expenses from the Operating Fee as deemed advisable by the Service Provider, to the extent contemplated by this Agreement or otherwise incurred in connection with the provision of Services by Service Provider. Notwithstanding the foregoing, Client is solely responsible for such costs and expenses of maintaining and operating Client's business (including but not limited to any costs and expenses resulting from any actions by third parties or changes or modifications in strategy or otherwise to the methodologies, vendors or resources initially used by Service Provider in connection with the provision of Services by Service Provider, to the extent that any such changes or modifications are reasonably required in the sole discretion of Service Provider.

c) In consideration of the performance of Services by Service Provider, and to support management services, Client shall, in addition to the Base Fee and Operating Fee, pay a monthly $200 "**Management Fee**." The fee shall not apply until the fifth (5) month of service, and shall continue thereafter.

d) As used herein, "**Operating Income**" means, for any given period, (x) the total Revenue for that period, _less_ (y) the total Operating Expenses for that period. "**Revenue**" means, for any given period, the revenue generated in connection with the operation of Client's business in the Amazon marketplace. Cashback rewards, credit card points or any other type of rewards generated during the business operation from a merchant/payment gateway/credit card company shall NOT be considered Revenue and shall not be counted as part of Profits or Operating Income generated. "**Operating Expenses**" means, for any given period, expenses incurred in connection with the operation of Client's business in the Amazon marketplace, which shall be paid by the Client, and _for the purposes of calculating "Operating Income,"_ shall be strictly limited to the following costs and expenses that Client approves, and is capable of monitoring:

    i.    Cost of goods from third-party vendors/suppliers that are supplying goods;

    ii.    Fees of third-party service providers needed to operate the business;

    iii.    Fees of account health protection, account reinstatement, other similar services that are provided by third party services;

4

**Attachment D**

DocuSign Envelope ID: 911749A2-00CA-4437-B4AF-B56B1D1D74D0

iv.    License or subscription fees for software used for accounting, forecasting, inventory management or similar purposes;

v.    Packing, packaging, labeling or otherwise preparing goods or products to comply with requirements as determined by Service Provider based upon Service Provider's experience and expertise; and

vi.    Assigned staff or Virtual Assistant costs related to operating the business.

*The Parties may, by mutual written agreement, amend this list for the purposes of determining Client's total "Operating Expenses" in any given period.*

*In no event shall Operating Expenses be deemed to include credit card charges, balances, interest, fees, or other credit card-related expenses. Furthermore, Client is solely responsible for covering all credit card-related expenses during and after this Agreement and shall not hold Service Provider liable for such expenses.*

e)    Service Provider shall have the right to audit the records of Client, and Client shall reasonably cooperate with any such request from Service Provider, to confirm the accuracy of any calculations provided by Client hereunder.

f)    Client acknowledges the nature of the business model carries the risk of Amazon account suspension and shall hold Service Provider harmless in such cases. It is in the sole discretion of the Service Provider to partner with third party companies as necessary to help with suspensions and/or account health. For example, these companies will attempt to acquire Wholesale Suppliers to match the ASINs in question, and will work in cooperation with Service Provider to achieve account health. Client agrees to cooperate with third party companies and follow given instructions, purchase inventory, and assist to facilitate the reinstatement process. Client agrees to pay the fees to third party companies in the event additional consulting or expertise is needed regarding suspensions and/or account health. Service Provider's internal appeals team shall assess and if possible, act on suspensions and/or account health issues prior to consulting with or outsourcing to third party companies.

g)    Service Provider shall issue monthly invoices to Client specifying the fees that are then due and payable by Client, together with any other ancillary expenses that may apply in connection with the Services described in this Agreement. Client shall pay all invoiced amounts due to Service Provider within fifteen (15) calendar days of the date of transmission to Client of such an invoice.

h)    Client shall pay interest on all late payments, calculated daily and compounded monthly at the lesser of the rate of one and one-half percent (1.5%) per month or the highest rate permissible under applicable law. Client shall also be required to reimburse Service Provider for all reasonable fees or costs incurred in connection with restoring or resuming any Services that have been suspended or disabled as a result of nonpayment by Client of invoiced amounts or otherwise in connection with pursuing or collecting any late payments, including, without limitation, attorneys' fees and fees charged by third party companies to reinstate the Amazon seller account. After thirty (30) calendar days of failure to pay invoices issued to Client, Service Provider shall pursue legal action against Client including actions by collection

5

**Attachment D**

PX7

000370

DocuSign Envelope ID: 911749A2-00CA-4437-B4AF-B56B1D1D74D0

agencies to collect debt owed. Under such circumstances, Client will bear the cost for attorney fees and other expenses that occur during this pursuit to collect debt.

i) Client may dispute any invoiced amounts by giving written notice to Service Provider of the nature of Client's dispute by no later than the due date of the applicable invoice, provided that the related invoice is paid full on or before the due date. The Parties shall cooperate and work together in good faith to resolve any such disputes. All invoiced amounts previously paid for and successfully disputed by Client will be returned to Client in the form of a monetary credit applied to future invoices. For the avoidance of doubt, a pending dispute or credit does not and will not release Client from its obligation to pay all invoiced amounts in full when due.

j) All payments owed to Service Provider under this Agreement shall be made by Client via wire transfer, check, or other means directed by Service Provider.

k) Client shall be solely and exclusively responsible for paying any and all applicable federal, state or local sales, use, excise, privilege or other taxes or similar assessments or duties, however and by whomever designated or levied, relating to or in connection with any amounts payable by Client to Service Provider hereunder or in connection with any Services provided by Service Provider to Client pursuant hereto and any other similar amounts in lieu thereof that may be paid or payable by Service Provider, exclusive of taxes based on Service Provider's net income or net worth. Service Provider will invoice Client for any such amounts that are required to be collected by Service Provider pursuant to any applicable law, rule, regulation or other requirement.

5.   Intellectual Property; Data Privacy.

a) Subject to and in accordance with the terms and conditions of this Agreement, Client grants Service Provider and its affiliates, associates, successors and assigns a limited, worldwide, transferable, non-exclusive, royalty-free license during the Term of this Agreement to use Client's intellectual property rights to the extent necessary, in Service Provider's reasonable discretion, to provide the Services to Client. The foregoing license rights shall include without limitation the right to display and use (i) Client's storefront name and trademarks (if any) related to such storefront name or affiliated account and (ii) copyrighted content on Client's related websites established during the onboarding process and related to the subject storefront(s).

b) Client hereby grants Service Provider a non-exclusive, worldwide, perpetual, irrevocable, transferable, sublicensable, royalty-free, fully paid up license to use, copy, reproduce, adapt, combine with other data, edit and re-format, generate, store, disclose, distribute, maintain a database of, and make derivative works based upon, any and all data and information regarding Client's ecommerce business exchanged under this Agreement, to improve the services offered by Service Provider. This license includes any suggestions, ideas, enhancement requests, feedback, or recommendations that Client provides to Service Provider regarding the Service.

c) The Client shall be solely and exclusively responsible, at all times with respect to the Client's business for which Service Provider is providing Services hereunder, for complying with any applicable the requirements of the EU General Data Protection Regulation ("**GDPR**") and other applicable data protection laws.

6

**Attachment D**

PX7

000371

DocuSign Envelope ID: 911749A2-00CA-4437-B4AF-B56B1D1D74D0

6.    Confidentiality.

a)    From time to time during the Term of this Agreement, either Party (as a "**Disclosing Party**") may disclose or make available to the other Party (as a "**Receiving Party**"), non-public, proprietary or confidential information and trade secrets of Disclosing Party ("**Confidential Information**"). If and to the extent that any such Disclosing Party wishes for any such Confidential Treatment to be protected as such pursuant to Section 6(b) hereof, such Confidential Information shall be clearly labeled or otherwise identified as "confidential" when disclosed or within five (5) calendar days thereafter. Notwithstanding the foregoing, the following shall be considered Confidential Information of Service Provider whether or not marked as "confidential": PowerPoint decks and other materials for case studies; affiliate program and other marketing materials of Service Provider; onboarding PowerPoint deck and other materials sent by Service Provider for the onboarding process; videos explaining onboarding and business methods; communication with Service Provider representatives, including but not limited to customer service team members, sales team members, legal team members, appeal team members, and officers. Confidential Information shall not include any information that:

i.    is or becomes generally available to the public other than as a result of Receiving Party's disclosure;

ii.   is or becomes available to the Receiving Party from a source other than Disclosing Party, provided that such source is not and was not prohibited from disclosing such Confidential Information to the Receiving Party;

iii.  was in Receiving Party's possession prior to Disclosing Party's disclosure to the Receiving Party; or

iv.   was or is independently developed by a Receiving Party without using a Disclosing Party's other Confidential Information.

b)    A Receiving Party shall:

i.    protect and safeguard the confidentiality of the Disclosing Party's Confidential Information with at least the same degree of care as the Receiving Party would protect its own Confidential Information, but in no event with less than a commercially reasonable degree of care;

ii.   not use the Disclosing Party's Confidential Information or permit it to be accessed or used, for any purpose other than to exercise its rights or perform its obligations under this Agreement; and

iii.  not disclose any such Confidential Information to any person or entity, except to employees or other members of the Receiving Party, with other members being limited to official Company Affiliates, employees and independent contractors, subcontractors, vendors, service providers or other staff who need to know the Confidential Information to assist the Receiving Party or act on its behalf, to exercise its rights or perform its obligations under this Agreement.

c)    Notwithstanding anything to the contrary contained in this Section 6 or elsewhere in this Agreement, if a Receiving Party reasonably believes that such Receiving Party is required by applicable law or legal process to disclose any Confidential Information, it may do so; provided, however, that prior to making such disclosure, such Receiving Party shall use reasonable efforts

7

**Attachment D**

DocuSign Envelope ID: 911749A2-00CA-4437-B4AF-B56B1D1D74D0

to notify Disclosing Party reasonably in advance of such disclosure so as to afford Disclosing Party the meaningful opportunity to pursue, at Disclosing Party's sole cost and expense, protection from disclosure.

d)  Notwithstanding anything to the contrary contained in this Section 6 or elsewhere in this Agreement, Client shall keep this Agreement and the terms thereof, including Service Provider's business practices, trade secrets, commercial methodologies, and other internal processes strictly confidential and shall not disclose them to any third parties without the prior written authorization of Service Provider, with the exception of: (i) Client's legal and tax advisors or (ii) to the extent required by law. Any form of public or private, oral or written defamation, slander, traducement, malicious misinterpretation of facts and events by the Client regarding the Service Provider, whether after the effective date of this Agreement or after its Termination, shall be treated as grounds of breach of contract and/or shall result in legal actions taken by Service Provider against Client.

7.  <u>Term</u>.

a)  The term of this Agreement shall commence on the Effective Date and continue for 12 months thereafter (the "**Term**") unless and until earlier terminated pursuant to Section 8.

b)  Agreement shall automatically renew every 12 months for successive 12-month periods, and if Client has achieved a 100% ROI (relative to the Base Fee value, $45,000.00                    ) during the prior 12-month period, Client shall pay a renewal fee to Service Provider of $5,000.00.

8.  <u>Termination; Effect of Termination</u>.

a)  <u>Termination without Cause</u>. Service Provider may not terminate this Agreement within 12 months of the Effective Date other than for cause (as outlined in Section 8(b)). Thereafter, Service Provider may terminate this Agreement at any time with or without cause, upon thirty (30) calendar days' written notice to Client. If the Service Provider terminates this Agreement without cause after the initial 12-month period, it shall facilitate transfer of full account management to a third-party service provider or, at Client's option, to Client if Client elects to run the account unilaterally, i.e., without assistance of a third-party service provider. Client may terminate the agreement at any time with or without cause upon thirty (30) calendar days' written notice to Service Provider, but shall not be entitled to any form of refund or other payment, including but not limited to the Base Fee or expenses or costs incurred in establishing or running the Amazon store(s). If Client terminates the agreement and transfers management to a third-party service provider, Empire shall be entitled to a mutually agreed upon portion of any amount exchanged between Client and third-party service provider.

b)  <u>Termination for Cause</u>. Any Party may terminate this Agreement, effective immediately upon written notice to the other Party (the "**Defaulting Party**"), if the Defaulting Party materially breaches this agreement, and such breach is incapable of cure or, with respect to a material breach capable of cure, if the Defaulting Party does not cure such breach within thirty (30) calendar days after receipt of written notice of such breach. Notwithstanding anything to the contrary under this Section 8(b), Service Provider may immediately suspend or disable the provision of any Services to Client if Client fails to timely pay in full any invoiced amounts

8

**Attachment D**

DocuSign Envelope ID: 911749A2-00CA-4437-B4AF-B56B1D1D74D0

when due hereunder, and upon written notice to Client may terminate this Agreement effective immediately if Client fails to fully cure, to the Service Provider's satisfaction, such non-payment within fifteen (15) calendar days after receipt of written notice of such non-payment.

c) Termination upon Change of Control. Client shall not be allowed to initiate or allow any form of change of ownership or control of the ecommerce business(es), which shall include for purposes of this section a transition of management of the ecommerce business of Client to a third-party service provider without first providing written notification to Service Provider before a "**Change of Control Event**" (as defined below) 14 calendar days prior to the occurrence of such Change of Control Event. Upon receipt of such notice, Service Provider shall have the option to terminate this Agreement with immediate effect upon written notice to Client of its election to terminate this Agreement. Client shall not be entitled to any form of refund or other payment, including but not limited to the Base Fee or expenses or costs incurred in establishing or running the Amazon store(s).

In any Change of Control Event, the Service Provider is entitled to:

    i.    Approval of the price paid to Client for said Change of Control event; and
    ii.    A mutually agreed upon percentage of the sale price.

"**Change of Control Event**" means the occurrence of any one or more of the following:

    i.    any sale, transfer or exchange of all or substantially all of the assets of the Client's business in one transaction or a series of related transactions;
    ii.    any change in service provider, such that a third-party service provider would assume tasks managed by the Service Provider;
    iii.    any sale, transfer, disposition, merger, consolidation, reorganization or combination of Client with, by, to or into any other company, entity or person, which would result in a change or transfer (whether in a single transaction or a series of related transactions) of the ownership of more than fifty percent (50%) of the voting capital stock, membership, partnership or other similar equity interests or rights in the Client; or
    iv.    any acquisition (whether in a single transaction or a series of related transactions) of the power to direct or cause the direction of, the Client's management, decisions or policies, whether through the ownership of voting equity interests, by contract or otherwise. Client is not allowed to remove Amazon account's "User Permissions" of Service Provider and such an action shall be regarded as a Change of Control Event and shall result in the same consequences as other Change of Control Events described above.

d) Termination for Insolvency Matters. Any Party may terminate this Agreement, effective immediately upon written notice to the other Party, if that other Party:
    i.    becomes insolvent or admits its inability to pay its debts generally as they become due;
    ii.    becomes subject, voluntarily or involuntarily, to any formal or informal proceeding under any domestic or foreign bankruptcy or insolvency law;
    iii.    is dissolved or liquidated or takes any corporate action for such purpose;
    iv.    makes a general assignment for the benefit of creditors; or

**Attachment D**

DocuSign Envelope ID: 911749A2-00CA-4437-B4AF-B56B1D1D74D0

     v.    has a receiver, trustee, custodian or similar agent appointed to take charge of or sell any material portion of its property or business.

e) <u>Effect of Termination</u>. Upon termination of this Agreement for any reason whatsoever under this Section 8, Client shall pay to Service Provider any and all amounts due to Service Provider and all outstanding work shall be deemed to have been terminated.

f) <u>Transition Services</u>. Client may request Service Provider to continue to perform certain Services and to assist with the transition of Client's business to a successor service provider or otherwise (collectively, "**Transition Services**"). After a written mutual consent between Parties, Service Provider can Transition Services to another Service Provider. This option becomes available after 6 months of the effective date of the start of this Agreement, on a case-by-case basis. If Service Provider accepts Client's request to Transition Services, the Parties shall negotiate in good faith mutually acceptable terms and conditions for the provision of Transition Services. The Client will not remove Amazon account's "User Permissions" of Service Provider unless and until the parties have come to an agreement such that removal is appropriate under the agreement.

9.    <u>Personnel</u>.

a) Service Provider will have sole responsibility for the assignment of personnel to perform any Services. Such personnel will not be restricted or prevented from performing similar services for others.

b) Service Provider may engage third parties to furnish services in connection with the Services in its sole discretion. In addition, Services may be performed by affiliates of Service Provider. No such engagement will relieve Service Provider from any of its obligations under this Agreement.

c) Client agrees not to attempt to establish a direct business or commercial relationship with the staff, affiliates, employees or independent contractors, and Virtual Assistants of Service Provider or offer them any form of employment. Any such attempts to circumvent Service Provider shall be treated as basis for breach of contract and immediate termination for cause and further legal action against Client.

10.   <u>Insurance</u>.

a) During the Term of this Agreement, Client shall, at its own expense, maintain and carry insurance in full force and effect with financially sound and reputable insurers, of the types and with the coverage limits mentioned above. Insurance is optional under this agreement, but highly recommended.

b) Upon Service Provider's request, Client shall provide Service Provider with a certificate of insurance from Client's insurer evidencing the insurance coverage specified in this Agreement. The certificate of insurance shall name Service Provider as an additional insured. Client shall provide Service Provider with sixty (60) calendar days' advance written notice in the event of a cancellation or material change in Client's insurance policy.

10

**Attachment D**

PX7

000375

DocuSign Envelope ID: 911749A2-00CA-4437-B4AF-B56B1D1D74D0

11.     No Other Representations or Warranties; Non-Reliance.

    a)  Service Provider represents and warrants that it shall perform the Services in a professional manner.

    b)  EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, (i) NEITHER THE SERVICE PROVIDER NOR ANY OTHER PERSON ON SERVICE PROVIDER'S BEHALF, HAS MADE OR MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, EITHER ORAL OR WRITTEN, WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE, TRADE OR OTHERWISE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED,

    c)  AND (ii) CLIENT ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE SERVICE PROVIDER OR ANY OTHER PERSON ON SERVICE PROVIDER'S BEHALF, EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT.

12.     Indemnification; Limitation of Liability.

    a)  Each Party shall indemnify, defend and hold the other Party and its respective directors, officers, agents, representatives, members, managers, employees, successors and assigns, harmless from and against any and all costs, damages, claims, suits, actions, liabilities, losses and judgments, including attorneys' fees, arising out of or relating to such Party's (i) breach of any representation and warranty or any covenant under this Agreement or any Statement of Work or other written document signed by both Parties relating to the subject of this Agreement, and (ii) negligence, fraud or willful misconduct of such Party, including the negligence, fraud or willful misconduct of the Parties' affiliates and representatives. In addition, Client shall indemnify, defend and hold the other Party and its respective directors, officers, agents, representatives, members, managers, employees, successors and assigns, harmless from and against any and all costs, damages, claims, suits, actions, liabilities, losses and judgments, including attorneys' fees, arising out of or relating to (A) Client's access to or use of the Services, (B) violation of GDPR or other data privacy requirements, (C) any suspension of Client's account with Amazon, (D) any violation or alleged violation by the Client's business of the terms of service of Amazon, and (E) the products sold via Client's business, including without limitation regarding (x) infringement of the intellectual property or other rights of any third party, (y) product liability claims, (z) violation of any applicable law.

    b)  IN NO EVENT SHALL SERVICE PROVIDER BE LIABLE TO CLIENT OR TO ANY THIRD PARTY FOR ANY LOSS OF USE, REVENUE OR PROFIT OR LOSS OF DATA OR DIMINUTION IN VALUE OR FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER OR NOT SERVICE PROVIDER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE.

**Attachment D**

PX7

000376

DocuSign Envelope ID: 911749A2-00CA-4437-B4AF-B56B1D1D74D0

c) IN NO EVENT SHALL SERVICE PROVIDER'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, EXCEED THE AGGREGATE AMOUNT PAID BY CLIENT TO SERVICE PROVIDER UNDER SECTION 4(A) FOR THE PORTION OF THE SERVICES GIVING RISE TO THE CLAIM.

d) Client shall bear (i) all collection risk (including, without limitation, credit card fraud and any other type of credit fraud) with respect to sales relating to Client's business and (ii) all responsibility and liability for the proper payment of all taxes or duties which may be levied or assessed (including, without limitation, sales taxes or duties) which may be levied in respect of sales relating to Client's business (iii) all credit risk including but not limited to credit cards and bank accounts closing due to high risk activity or interest rates increasing for Client's loans and Credit Card debt or any form of bank account or credit history damages.

e) Service Provider has no obligation to attempt to monitor or regulate the quality, suitability or content of any goods or products relating to Client's business and Client shall hold Service Provider harmless in the event of any claims relating to or arising from such goods or products. Client hereby represents and warrants to Service Provider that such goods or products will not infringe on or violate the intellectual property or other rights of any third party and will not contain any content which violates any applicable law, regulation or third-party rights.

f) Client understands and hereby acknowledges that there are inherent risks and uncertainties involved in the development and operation of Client's business as contemplated by this Agreement, and such risks and uncertainties form part of the business risk involved in the Client undertaking to obtain Services from Service Provider. Accordingly, Client hereby acknowledges that it is entering into this Agreement with full knowledge of such risks and uncertainties, and hereby also accepts such risks and uncertainties. Client further understands and hereby acknowledges that Service Provider has made no guarantee or representation and warranty regarding the success or performance of Client's business for which Service Provider is providing Services pursuant to this Agreement.

13. <u>Prohibition of Class and Representative Actions and Non-Individualized Relief.</u>

CLIENT AND SERVICE PROVIDER AGREE THAT EACH PARTY MAY BRING CLAIMS AGAINST THE OTHER ONLY ON AN INDIVIDUAL BASIS AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION OR PROCEEDING. UNLESS BOTH CLIENT AND SERVICE PROVIDER AGREE OTHERWISE, THE ARBITRATOR MAY NOT CONSOLIDATE OR JOIN MORE THAN ONE PERSON'S OR PARTY'S CLAIMS AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A CONSOLIDATED, REPRESENTATIVE, OR CLASS PROCEEDING. ALSO, THE ARBITRATOR MAY AWARD RELIEF (INCLUDING MONETARY, INJUNCTIVE, AND DECLARATORY RELIEF) ONLY IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF NECESSITATED BY THAT PARTY'S INDIVIDUAL CLAIM(S), EXCEPT THAT YOU MAY PURSUE A CLAIM FOR AND THE ARBITRATOR MAY AWARD PUBLIC INJUNCTIVE RELIEF UNDER APPLICABLE LAW TO THE EXTENT REQUIRED FOR THE ENFORCEABILITY OF THIS PROVISION.

12

**Attachment D**

DocuSign Envelope ID: 911749A2-00CA-4437-B4AF-B56B1D1D74D0

14.   Miscellaneous.

    a)   Entire Agreement. This Agreement, including any related exhibits and schedules attached hereto, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

    b)   Notices. All notices, requests, consents, claims, demands, waivers, and other communications hereunder (each, a "**Notice**") shall be in writing and addressed to the Parties at the addresses set forth in the operative Statements of Work (or to such other address that may be designated by the receiving party from time to time in accordance with this Section 14(b)). All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), or certified or registered mail (in each aforementioned case, return receipt and signature required, postage prepaid); facsimile, e-mail, or other electronic delivery (with confirmation of transmission and delivery). Except as otherwise provided in this Agreement, a Notice is effective only (i) upon receipt by the receiving Party, and (ii) if the Party giving the Notice has complied with the requirements of this Section 14(b).

**Notices Information:**

*If to Service Provider*:

| | |
|---|---|
| **Company Name:** | Onyx Distribution LLC |
| **Attn:** | Roman Cresto |
| **Address:** | ███████████████ |
| | Encinitas, CA ████████ |
| **Email:** | sales@onyxdistributionco.com |
| **Phone:** | 1-888-933-6747 |

*If to Client*:

| | |
|---|---|
| **Company Name:** | |
| **Attn:** | Christine Rodríguez |
| **Address:** | ████████████ |
| **Email:** | ████████ |
| **Phone:** | █████ |

13

**Attachment D**

DocuSign Envelope ID: 911749A2-00CA-4437-B4AF-B56B1D1D74D0

c) <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

d) <u>Amendment and Modification</u>. No amendment to or modification of this Agreement is effective unless it is in writing and signed by each Party.

e) <u>Waiver</u>. No waiver by either Party of any of the provisions hereof shall be effective unless explicitly set out in writing and signed by the Party so waiving. No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

f) <u>Assignment</u>. Client shall not assign, transfer, delegate or subcontract any of its rights or delegate any of its obligations under this Agreement without the prior written consent of Service Provider. Any purported assignment or delegation in violation of this Section 14(f) shall be null and void. No assignment or delegation shall relieve the Customer of any of its obligations under this Agreement. Service Provider may assign any of its rights or delegate any of its obligations to any affiliate or to any person acquiring Service Provider's assets without Client's consent. This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

g) <u>Choice of Law</u>. The validity, interpretation, construction and performance of this Agreement shall be governed by the internal laws of the State of California, without giving effect to any choice or conflict of law provisions or rules (whether in the State of California or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of California.

h) <u>Arbitration</u>. Any controversy or claim arising out of or relating to this Agreement or the breach thereof, shall be settled by binding arbitration administered by the American Arbitration Association in the State of California, County of San Diego in accordance with its Commercial Arbitration Rules. The prevailing Party in any such arbitration proceeding shall be entitled to an award of reasonable attorneys' fees and costs. Judgment on the award may be entered in the state and federal courts located in the State of California, County of San Diego, and the Parties hereby irrevocably consent to the exclusive jurisdiction of those courts for the purposes herein.

i) <u>Survival</u>. The rights and obligations of the Parties set forth in this Section 14(i) and in Sections 1(d), 4(e)-(j), 5, 8, 11 and 12 and any right or obligation of the parties in this Agreement which, by its nature, should survive termination of this Agreement, will survive any such termination this Agreement.

j) <u>Relationship of Parties</u>. Nothing in this Agreement creates any agency, joint venture, partnership or other form of joint enterprise, employment or fiduciary relationship between the Parties.

14

**Attachment D**

DocuSign Envelope ID: 911749A2-00CA-4437-B4AF-B56B1D1D74D0

Service Provider is an independent contractor pursuant to this Agreement. Neither Party has any express or implied right or authority to assume or create any obligations on behalf of or in the name of the other Party or to bind the other Party to any contract, agreement or undertaking with any third party.

k) <u>Force Majeure</u>. Service Provider shall not be liable or responsible to Client, nor be deemed to have defaulted or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement when and to the extent such failure or delay is caused by or results from acts or circumstances beyond the reasonable control of Service Provider including, without limitation, acts of God, flood, fire, earthquake, explosion, governmental actions, war, invasion or hostilities (whether war is declared or not), terrorist threats or acts, riot or other civil unrest, national emergency, revolution, insurrection, epidemic, lock-outs, strikes or other labor disputes (whether or not relating to either Party's workforce) or restraints or delays affecting carriers or inability or delay in obtaining supplies of adequate or suitable materials, materials or telecommunication breakdown or power outage.

l) <u>Affiliate Referral</u>. If the Client was referred to the Service Provider by an Empire/Onyx Affiliate, previously registered and approved by the Service Provider, please provide his or her contact information below. The Affiliate listed will receive a referral fee per the structure outlined under the Service Provider's Affiliate Contract, which is an agreement separate from this Agreement. Please disregard 14(l) if you are not a new customer for the Service Provider.

**Affiliate Name:**           NA

**Affiliate Phone Number:**   NA

**Affiliate Address:**        NA

**Affiliate Email:**          NA

15.   <u>Additional Terms</u>.

 - Service Provider shall issue a $1,000 credit applied to profit split invoices for

 the Amazon Store contemplated by this agreement ("Amazon Contract").

 - There shall be no profit split for the first three months, i.e., Client shall retain

 100% of profits for months 1, 2 and 3.

 - By signing below, Parties acknowledge this agreement as executed contemporaneously

15

**Attachment D**

DocuSign Envelope ID: 911749A2-00CA-4437-B4AF-B56B1D1D74D0

with the Termination and Release agreement regarding the August 19, 2021

Walmart Agreement.


IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the Effective Date.


**Company Name:**     Onyx Distribution LLC

**Signature:**     *Roman Cresto*
                   77620376EACC402...

**Name:**     Roman Cresto

**Title:**     CEO

**Date:**     3/4/2022



**Company Name:**     _____

**Signature:**     29386E79A63C43E...

**Name:**     Christine Rodríguez

**Title:**     _____

**Date:**     3/4/2022

**Attachment D**


PX7

000381



**Christy**

## Fwd: Return Losses
1 me   age

christine
To: CHRISTINE ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ >                                    Wed, Mar 1, 2023 at 4:56 PM

Begin forwarded message:

**From** chri tine ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Date:** September 14, 2022 at 5:17:48 PM EDT
**To:** Jacob Faust <jacob@empireecomm.com>
**Subject: Re: Return Losses**

Hi Jacob, I wanted to follow up with respect to the appeal. To say that I am
frustrated is an understatement. it's been almost a month now since my store got suspended and I really
have no idea what caused the suspension, although I have my suspicions, and I truly don't have any
concrete feedback from you or anyone el e on the team other than to inform me that the appeal i  pending

If you would put yourself in my shoes for one second, you would also feel underwhelmed by Empire's
performance with respect to my investment at this point.

 I'd appreciate any update. I've just had to fork over $10,000 in minimum payments for my lines out of my
own personal funds and this is something that was never told to me when I signed up. I think it's really
important that you tell prospective store owners that they should have money in savings in case their store
get   u pended  I have a family to  upport and thi  i  cau ing great financial  tre

I have been extremely patient, understanding and reasonable. I have remained as patient as I can possibly
remain under my very difficult circumstances for the last year now!

Two stores now and 2 suspensions within 60 days of each store's open.

As I mentioned to Nick on my last call im not just an average client.  I'm also a lawyer and I've been wearing
my human hat throughout all of my interaction  and maybe it'  time that I  tart putting on my lawyer hat
because I just don't know what else to do and I'm not getting the proper response to any of this.

I understand that this may not be in your hands at all but at this juncture I really do feel like I should've been
connecting with  omeone who can give me  ome very  pecific and concrete an wer  and not ju t generic
responses. I await to hear from you.

Christine

On Sep 8, 2022, at 8 54 PM, Jacob Fau t  jacob@empireecomm com  wrote

Hi Christine,

Ye , the third party i  al o conducting an audit/looking into your  pecific Seller Team to
determine the cause of these issues and how they can be mitigated moving forward. As far as
timeline is concerned, it's hard to say. I know additional communication is being submitted to
Amazon this week, so ideally we will have some more concrete idea on timing once Amazon
re pond  there

**Attachment E**

**PX7**
**000382**

Best,

Jacob



**Jacob Faust**
Director of Operations
Empire Ecommerce LLC
8605 Santa Monica Blvd, Suite 51976, West Hollywood, CA 90069
jacob@empireecomm.com

Confidentiality Notice
This communication constitutes an electronic communication within the meaning of the Electronic
Communications Privacy Act, 18 U.S.C. Section 2510, and its disclosure is strictly limited to
the recipient intended by the sender of this message. This transmission, and any attachments, may
contain confidential attorney client privileged information and attorney work product  If you are not
the intended recipient, any disclosure, copying, distribution or use of any of the information contained
in or attached to this transmission is STRICTLY PROHIBITED. Please contact us immediately by
return e-mail or at 404 815 6500, and destroy the original transmission and its attachments without
reading or  aving in any manner

***DISCLAIMER*** Per Treasury Department Circular 230: Any U.S. federal tax advice contained in
this communication (including any attachments) is not intended or written to be used, and cannot be
u  ed, for the purpo  e of (i) avoiding penaltie   under the Internal Revenue Code or (ii) promoting,
marketing or recommending to another party any transaction or matter addressed herein.

Sent via Superhuman

On Wed, Sep 07, 2022 at 3:10 AM, christine███████████████████> wrote:
Hi Jacob, I mean the inve  tigation performed by the third party  I  there anyway we can
mitigate any issues in the future.  As I have said before I have highlighted some
performance issues and maybe they did or
Did not contribute to the suspension like improper listings, not responding to
Me   age , OOS, lot  of return   Can you  hed  ome light on the e i  ue  plea  e and al o
how long do you expect the appeal process to last? Thank you

Christy

On Sep 6, 2022, at 9 36 PM, Jacob Fau  t   jacob@empireecomm com
wrote:


The team did look more into your situation, but sadly, we are up against the
roadblock that i  Amazon'  general unwillingne    to  hare in  ight into their
internal investigation. At this time, all the appeal team is able to do is provide
them with the requested information. Now, we are waiting on their recent
response to properly diagnose next steps.

Best,

Jacob



**Jacob Faust**

**Attachment E**

**PX7**
**000383**

3/1/23, 4:56 PM                                   Gmail - Fwd: Return Losses

Director of Operations
Empire Ecommerce LLC
8605 Santa Monica Blvd, Suite 51976, We t Hollywood, CA 90069
jacob@empireecomm.com

Confidentiality Notice:
Thi  communication con titute  an electronic communication within the meaning of
the Electronic Communications Privacy Act, 18 U.S.C. Section 2510, and its
disclosure is strictly limited to the recipient intended by the sender of this message.
This transmission, and any attachments, may contain confidential attorney-client
privileged information and attorney work product  If you are not the intended
recipient, any disclosure, copying, distribution or use of any of the information
contained in or attached to this transmission is STRICTLY PROHIBITED. Please
contact us immediately by return e-mail or at 404 815 6500, and destroy the original
tran mi  ion and it  attachment  without reading or  aving in any manner

***DISCLAIMER*** Per Treasury Department Circular 230: Any U.S. federal tax
advice contained in this communication (including any attachments) is not
intended or written to be u ed, and cannot be u ed, for the purpo e of (i) avoiding
penalties under the Internal Revenue Code or (ii) promoting, marketing or
recommending to another party any transaction or matter addressed herein.

Sent via Superhuman

On Tue, Sep 06, 2022 at 11 44 AM, chri  tine ██████████ wrote:

> Hi Jacob, I hope you had a nice long weekend. I know that the third party is
> in the process of sending my appeal letter. However, is there any feedback
> you can provide regarding the inve tigation that wa  performed on my
> store.?I would really appreciate it. I feel a little bit lost navigating all of this.
> Any guidance and feedback is greatly appreciated. Thank you

> Chri ty

>> On Aug 29, 2022, at 6:36 PM, Jacob Faust
>> <jacob@empireecomm.com> wrote:

>> The third party i   till in fact looking into it; I believe they are
>> drafting up their first correspondence to Amazon now.

>> On Mon, Aug 29, 2022 at 9:07 AM christine rodriguez
>> ████████████ wrote:

>>> Hi thank you! When can I expect to hear about the analysis
>>> on the store.

>>> On Aug 29, 2022, at 11:36 AM, Jacob Faust
>>> jacob@empireecomm com  wrote:

>>> Hey Christine,

>>> I will  end thi  over to our Help De  k and
>>> have our returns specialist answer you today.
>>> Please be on the lookout for their response!

>>> On Sun, Aug 28, 2022 at 5 31 PM chri  tine
>>> ██████████ wrote:

**Attachment E**

**PX7**
**000384**

Hi Jacob, I know you are in the process of getting my store reactivated.  However, I want to address another concerning issue.

There are losses to me this month in the amount of $3,400 for multiple reasons: customers who do not return items, customer who return items to amazon, customers who say they never received the item, **yet the tracking shows delivered,** customers who claim items are damaged yet do not return them.  **This number is significantly high and really just guts my profits.**  Please see attached excel sheet for detailed summary for each order.

**How can this be mitigated?**

Also, although not a loss, in a few instances I see that orders were not placed with the supplier and of course the customer was refunded.

Please advise.  Maybe I did not understand the amount of time I was expected to put into this venture but I thought this was really passive income yet I have spent hours auditing my account because I simply cannot afford to lose this kind of money considering that I have not even really hit the ground running given my now 2 suspended stores and I am nowhere near getting my return on the initial investment.  Please help.

Christine

--
Best,

Jacob

**Jacob Faust**
Director of Operations
Empire Ecommerce LLC
8605 Santa Monica Blvd, Suite 51976, West Hollywood, CA 90069
jacob@empireecomm.com

Confidentiality Notice:
This communication constitutes an electronic communication within the meaning of the Electronic Communications Privacy Act, 18 U.S.C. Section 2510, and its disclosure is strictly limited to the recipient intended by the sender of this message. This transmission, and any attachments, may contain confidential attorney-client privileged information

**Attachment E**

**PX7**
**000385**

and attorney work product. If you are not
the intended recipient, any disclosure, copying,
distribution or use of any of the information
contained in or attached to this transmission is
STRICTLY PROHIBITED. Please contact us
immediately by return e-mail or at 404 815 6500,
and destroy the original transmission and its
attachments without reading or saving in any
manner.

***DISCLAIMER*** Per Treasury Department
Circular 230: Any U.S. federal tax advice
contained in this communication (including any
attachments) is not intended or written to be
used, and cannot be used, for the purpose of (i)
avoiding penalties under the Internal Revenue
Code or (ii) promoting, marketing or
recommending to another party any transaction
or matter addressed herein.



--
Best,

Jacob

**Jacob Faust**
Director of Operations
Empire Ecommerce LLC
8605 Santa Monica Blvd, Suite 51976, West Hollywood, CA 90069
jacob@empireecomm.com

Confidentiality Notice:
This communication constitutes an electronic communication
within the meaning of the Electronic Communications Privacy Act,
18 U.S.C. Section 2510, and its disclosure is strictly limited to
the recipient intended by the sender of this message. This
transmission, and any attachments, may contain
confidential attorney-client privileged information and attorney
work product. If you are not the intended recipient, any
disclosure, copying, distribution or use of any of the information
contained in or attached to this transmission is STRICTLY
PROHIBITED. Please contact us immediately by return e-mail or
at 404 815 6500, and destroy the original transmission and its
attachments without reading or saving in any manner.

***DISCLAIMER*** Per Treasury Department Circular 230: Any
U.S. federal tax advice contained in this communication (including
any attachments) is not intended or written to be used, and cannot
be used, for the purpose of (i) avoiding penalties under the
Internal Revenue Code or (ii) promoting, marketing or
recommending to another party any transaction or
matter addressed herein.



**Attachment E**

any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.



**empire-ecommerce-small-logo.jpg**
23K

---

**Christy ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇>**                                   Fri, Oct 21, 2022 at 10:37 AM
To: Roman Cresto <roman@empireecomm.com>

Roman, please respond to my lawyer's correspondence so we can negotiate a termination.

Christine

> On Sep 26, 2022, at 5:18 PM, Roman Cresto <roman@empireecomm.com> wrote:
>
>
> Hi Christy,
>
> I received both of your recent emails. We are currently appealing your recent suspension with the goal to get the account reactivated. However, sometimes your account may not be able to be reactivated given the type of suspension that Amazon puts on your account. This is case by case. If this is the case, we will push for funds disbursement on your account. Sometimes appeals get rejected, in which we have to submit a new appeal letter. Please see Jacobs's emails for more detailed updates on your appeal process and respond accordingly if you need any clarification as we continue to work on your appeal.
>
> The following are the options to move forward:
>
> 1. A $7500 refund and termination of your client status with us.
> 2. We will continue to work on your appeal and we can start up another store for you and run it via FBM
> 3. We will continue to work on your appeal and we can start up another store for you and run it via FBA
>
> Please let us know if you have any questions.
>
> On Fri, 23 Sept 2022 at 16:12, Christy ▇▇▇▇▇▇▇▇▇▇▇▇▇▇> wrote:

# Roman,  I don't even know what you mean by move me to another store?  I'm not going to keep playing ping-pong here.  This is not what I signed up for.

**Attachment F**

PX7
000387

# What's going on with my appeal? Again I see you publicly marketing Empire as experts who can undo section 3 suspensions quickly …yet here we are on week five and I have heard NOTHING back from your team about the appeal process.  Why do I need to be moved to another store? What store? Why won't my appeal be successful? All of these unanswered questions!

# I am really becoming inclined to approach this matter like the lawyer I am because my experience with Empire has not at all been inline with what you market or what the contract for FBM I signed said it would be.

Continuously moving people out of stores because of suspensions is not what I signed up for.   This model you have propagated does not pass the smell test and I am not comfortable continuing to hide in shadows of different stores running from Amazon.

Empire had a duty to operate my store in the best manner possible, yet there were and continue to be so many deficiencies. You have not fulfilled your end of the bargain. This is on the verge of turning into a legal matter.  I stress …. I REALLY want to amicably walk away from this but offering me $7500 is frankly insulting considering my significant losses.  Even walking away with the refund I am requesting from you I will be at a huge loss.

This is not acceptable. If you want to take this route so be it. I can absolutely do that as I litigate for a living.

I have tried to approach this from different angles, business like, professional , giving you the benefit of the doubt and with an extreme amount of patience.

How can you not look at my situation and arrive at the conclusion that my store was run beyond inefficiently? Just look at the returns.  Look at the refunds.  Look at the nature of the messages and look at the sales sheet.  I'm in the red.

**Attachment F**

**PX7**
**000388**

I'm not going to keep going back-and-forth.I will not sit down and take this lightly  and am realizing that now I'm going to  have to take a different route.

My final offer is $30,000.  Again, I will sign a termination, release and  a confidentiality agreement as consideration for settlement, and short of that Roman I guess we let the chips fall where they may.

I would seriously consider the value in my signing a confidentiality agreement with you now.
You are leaving me no choice here and there is plenty of documentation and paper trail to show the evolution of this situation and my patience, cooperation, grievances and frustration for the last 13 months.

And the most egregious of all is that no one has taken the time to explain  why this happened AGAIN. I just continue to get shoved around with lame excuses and no solutions that solve anything. Quite the contrary your options only require more investment , time and what fee like questionable practices.

I am running out of time with respect to my monetary obligations here and the lines that I have to pay so I don't have time to keep going back-and-forth.

And by all means please share with me how you feel that you have fulfilled your end of the bargain. Provide feedback on your take on how my store was run. Because all I hear is crickets from you on that front. I await your response.

Christine

> On Sep 23, 2022, at 5:55 PM, Roman Cresto <roman@empireecomm.com> wrote:
>
>
> Hi Christy,
>
> I am sorry to hear that you do not want to move to FBA. We can move to another FBM store but I wanted to offer you FBA given your history.
>
> Jacob already explained that we use certain strategies like selling high-ticket products on Walmart so the screenshot you sent is not applicable to what you described.
>
> In regards to your request for a partial refund: Given our conversation, we can offer a partial refund of $7500. I know this is not what you were looking for but as I mentioned before we do not offer refunds. I can make an exception here if this is how you want to proceed. Otherwise, we still have the option to move you to another store.
>
> Please let me know your thoughts on the above.
>
>> On Fri, 23 Sept 2022 at 08:19, Christy ██████████████████ wrote:
>> Good afternoon Roman, I wanted to check in and see if you had a chance to review my
>> proposal. Again as you can imagine I am incredibly distressed about everything that has
>> happened. Every day is another loss to me because I'm paying interest on my lines.
>> Every day as my store sits in suspension mode I see refunds and return requests coming
>> in.  As I mentioned even when I get the money from Amazon I will have a negative
>> balance and I will have to supplement the lines. I truly need to cut my losses as soon as
>> possible so that my hole doesn't get bigger. Please let me know where you stand on this
>> proposal. I cannot continue to sit and wait.
>>
>> Even though you guys continue to market your efficiency with overturning suspensions
>> with respect to section 3 of the Amazon policy, my store is still sitting in suspension after

**Attachment F**

**PX7**
**000389**

five weeks so how can that be, again when it comes to me I feel like your business model has not been effective for me?

I know this is not your concern and it's outside the scope of your business analysis but from human to human, I have a family and this is causing huge financial distress for everyone in my household.

I look forward to hearing from you.

Christine

On Sep 20, 2022, at 7:43 PM, Christy ████████████ wrote:

Good evening Roman,

I am writing in follow up to our conversation.  I appreciate your time and your proposed solution to my current unfortunate situation.  I have seriously considered your offer and for the reasons below, I respectfully decline. I signed up for a Walmart Store in 2021 which failed after 60 days, was onboarded to an Amazon store which failed after 60 days, and now I am being told that its either FBA or I cannot continue selling because the drop shipping model is no longer viable for me.

You can imagine how incredibly distressed I am at this juncture given that my store was active for 60 days after waiting almost a year to get going!  This is not what I was promised and this is not what Empire markets to the public about its services.  You represent that you are experts in this field. Unfortunately, this has not been my experience with your company.

     I have been patient, responsive and extremely accommodating throughout all of the challenges for the last 13 months.  I am not willing to lose anymore capital and because you cannot guaranty no risk to me with the FBA model, I simply do not wish to enter into that venture.  You are essentially asking me to give Empire a third chance to make good on my

**Attachment F**

investment.  As I explained to you, I am in the red after 13 months, and not even at break even.

Aside from all the performance deficiencies that I alerted customer service about, how am I supposed to interpret the above post on Empire's IG page speaking of using a variety of suppliers to avoid suspensions but yet EVERY single order on my store was fulfilled by Walmart?  It's like my store was begging to be suspended and no one on your end did anything about it despite my multiple notices.  Also, the amount of returns and refunds due to late deliveries, incorrect product received v. product listed and not to mention all of the inventory that I have to pay for when customers asked for refunds yet did not return the product (this number is over $4,000! – eating up any profit).  I am operating at a loss even if I get Amazon to disburse my funds becasue I owe more on my lines than what I will be getting from Amazon.

This was by no means a passive investment.  I spent hours reconciling my amazon account, charges on my lines, reviewing refunds and returns and reading all the reasons why my store was not performing optimally.  I invite you to log into my store and conduct your own audit.

Here is my offer:  I am willing to sign a termination and release with a confidentiality provision in exchange for a refund of $32,500 (willing to lose $2,500 allocated to administrative expenses).  I know that you will have to invest in switching me to FBA and forgo the commission split for 4 months per our current agreement.  Instead, I am offering a solution that will cut both of our losses.  I know investments come with risks and sometimes we have to take it on the chin, but in this situation, I feel Empire needs to take it on the chin as well.  I wish to  resolve this situation ASAP and part ways respectfully and amicably.  I believe it is equitable to

Attachment F

refund my investment because Empire has not used commercially reasonable efforts to manage my investment and operate my store in a profitable manner.  In fact, the manner in which my store was operated made it very easy for Amazon to suspend me.  Even now, there are no answers provided to me as to why this happened and to compound the issue, you are telling me that I cannot go back to drop shipping which is what I contracted for, not FBA.  Although Jacob and Nick informed me that I would be getting detailed feedback on the appeal and suspension, this has not happened and it has been over a month since my store was suspended.   This is not how experts in a field operate.

Even if you refund my investment, I am walking away at a loss all the way around – a loss of my time and my capital.  I ask you to honor your word as I have honored my commitments and have done everything I could as a customer to be efficient and responsive.   Unfortunately, I cannot say the same thing about your team.

I look forward to hearing from you.  Please also provide an update on when I can reasonably expect my disbursement from Amazon.

Sincerely,

Christine Rodriguez

Christy

**Attachment F**

**PX7**
**000392**